201821davic

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x
     UNITED STATES OF AMERICA
 3

 4         v.                          17 Cr. 364(CS)

 5                                     CONFERENCE

 6

 7   SKYLAR DAVIS, a/k/a "S-Dot";
     ARDAE HINES, a/k/a "Young Money"
 8             a/k/a "YM";
     DAVONTE HAWKINS, a/k/a "Dirty D";
 9   MICHAEL SIMMONS, a/k/a "LoSo";
     DEMETRICE McLEAN, a/k/a "Blocks"
10             a/k/a "Demit";
     CHRISTOPHER DAVIS, a/k/a "Whitebread";
11   DIAMANTE FRAZIER, a/k/a "Bro God";
     DITAVIOUS WILLIAMS, a/k/a "Glock Doc";
12   DONTE NUGENT, a/k/a "Wildman";
     DAVANTE NUGENT, a/k/a "Trap God"
13             a/k/a "Tay Tay";
     CALVIN LEMBHARD, a/k/a "Forty";
14   PARADISE BRANCH, a/k/a "Bigga"
               a/k/a "Petey";
15   WILLIAM FENNELL, a/k/a "Mills";
     WILFREDO RUIZ, a/k/a "Pop";
16   TEVON ADAMS, a/k/a "Cooj";
     DWIGHT McCARDLE, a/k/a "Ike";
17   TRISTAN HILGERS;
     SETH BLAIN;
18   KYLE BLAIN;
     ROBERT ZUCHOWSKI,
19
                   Defendants.
20   ------------------------------------x

21                                     United States Courthouse
                                       White Plains, N.Y.
22                                     February 1, 2018
                                       11:30 a.m.
23

24
     Before:  THE HONORABLE CATHY SEIBEL, District Judge
25
```

201821davic

1                              APPEARANCES

2

3    GEOFFREY S. BERMAN
          United States Attorney for the
          Southern District of New York
4    ALLISON NICHOLS
     MAURENE COMEY
5         Assistant United States Attorneys

6

7    JILL R. SHELLOW
          Attorney for Defendant Davis
8

9    RICHARD PALMA
          Attorney for Defendant Hines
10

11   ROBERT L. PEABODY
     FLORIAN MIEDEL
12        Attorneys for Defendant Hawkins

13

14   STEWART L. ORDEN
          Attorney for Defendant Simmons

15

16   LORI COHEN
          Attorney for Defendant McLean
17

18   KARLOFF CYLTON COMMISSIONG
          Attorney for Defendant Christopher Davis
19   BY:   MICHAEL K. BACHRACH

20

21   LLOYD EPSTEIN
          Attorney for Defendant Frazier
22   BY:   JILL SHELLOW

23

24   KENNETH A. PAUL
          Attorney for Defendant Williams

25   (Continued)

201821davic

1                              APPEARANCES

2

   LORRAINE GAULI-RUFO
3       Attorney for Defendant Donte Nugent

4

   JAMES E. NEUMAN
5       Attorney for Defendant Davante Nugent

6

7  DONALD JOSEPH YANNELLA, III
        Attorney for Defendant Lembhard
8

9  RICHARD BRUCE LIND
        Attorney for Defendant Branch
10

11 SCOTT B. TULMAN
        Attorney for Defendant Fennell
12

13 BRADLEY LAMAR HENRY
        Attorney for Defendant Adams
14

15 LEE ALAN GINSBERG
        Attorney for Defendant McCardle
16

17 MATTHEW J. KLUGER
        Attorney for Defendant Hilgers
18

19 DONNA RITA NEWMAN
        Attorney for Defendant Seth Blain
20

21 DAVID KEITH BERTAN
        Attorney for Defendant Kyle Blain
22

23 JAMES MICHAEL ROTH
        Attorney for Defendant Zuchowski
24

25 MICHAEL KEITH BACHRACH
        Attorney for Defendant Young

201821davic

1          THE DEPUTY CLERK:  The Honorable Cathy Seibel

2    presiding.

3          United States of America against Davis, et al.

4          THE COURT:  Good morning.  Everyone can have a seat.

5          Let me get the who's who.

6          Ms. Shellow and Mr. Davis.  Where are you?

7          There's Ms. Shellow and Mr. Davis.

8          THE COURT:  Good morning.

9          And Mr. Palma.

10          MR. PALMA:  Here, your Honor.

11          THE COURT:  There you are.

12          And Mr. Hines.

13          MR. PALMA:  Mr. Hines is first row.

14          THE COURT:  And Mr. Hawkins.

15          MR. PEABODY:  Mr. Hawkins is third from the left,

16    your Honor.

17          THE COURT:  All right.

18          MR. PEABODY:  I'm Mr. Peabody, Robert Peabody, but

19    I'm withdrawing today with the Court's leave.  Mr. Florian

20    Miedel has been --

21          MR. MIEDEL:  Florian Miedel.  I'm hoping you will be

22    appointing me today.

23          THE COURT:  Yes.  I got Mr. Peabody's application to

24    withdraw because, sadly, he is leaving our panel, and we would

25    have needed to talk about Capital Panel counsel, anyway, today

| | |
|---|---|
| 1 | for Mr. Hawkins, so thank you, Mr. Miedel, for coming up on |
| 2 | such short notice.  I will grant Mr. Peabody's application to |
| 3 | be relieved. |
| 4 | And I will sign whatever I need to sign, but you need |
| 5 | to tell me what I need to sign to appoint Mr. Miedel. |
| 6 | MR. PEABODY:  Thank you, Judge. |
| 7 | THE COURT:  Then Mr. Simmons and Mr. Orden. |
| 8 | MR. ORDEN:  Good morning, your Honor. |
| 9 | THE COURT:  Good morning. |
| 10 | Mr. McLean and Ms. Cohen. |
| 11 | MS. COHEN:  Good morning, your Honor. |
| 12 | THE COURT:  There you are. |
| 13 | Mr. Davis.  I got a letter from Mr. Commissiong at |
| 14 | like 10:45 last night that he had a conflict, and he said |
| 15 | Mr. Bachrach was coming in his place. |
| 16 | MR. BACHRACH:  Good afternoon.  Or good morning, your |
| 17 | Honor. |
| 18 | THE COURT:  Please pass on to Mr. Commissiong that he |
| 19 | must have known about his conflict well before last night, and |
| 20 | he should have gotten me that letter sooner. |
| 21 | What would he have done if I came in this morning and |
| 22 | said no? |
| 23 | MR. BACHRACH:  I will tell him that, your Honor.  I |
| 24 | know he found out about the conflict yesterday afternoon when |
| 25 | speaking with me, after I had been appointed to represent |

1    Mr. Young, and he thought the conference was on for tomorrow.

2    And I guess he had been on trial when your Honor changed the

3    date.  And he did tell me to apologize.

4               THE COURT:  Okay.

5               And Mr. Frazier.

6               And, Ms. Shellow, you're pitch hitting for

7    Mr. Epstein?

8               MS. SHELLOW:  I am, your Honor.

9               THE COURT:  All right.

10              Mr. Williams and Mr. Paul.  I saw you there.

11              MR. PAUL:  Good morning.

12              THE COURT:  There you are.

13              Mr. Nugent.  Where's Mr. Donte Nugent?

14              MS. RUFO: Your Honor, he's in the second row closest

15   to your Honor.

16              Lorraine Gauli Rufo.

17              THE COURT:  Good morning, Ms. Rufo.

18              MS. RUFO:  Good morning, your Honor.

19              THE COURT:  And then Davante Nugent.  Good morning.

20              And, Mr. Neuman, where are you?

21              MR. NEUMAN:  Yes, your Honor.

22              THE COURT:  There you are.

23              Mr. Lembhard and Mr. Yannella.  Good morning.

24              MR. YANNELL:  Right here.

25              THE COURT:  Mr. Branch and Mr. Lind.  Good morning.

201821davic

1              MR. LIND:  Good morning, Judge.

2              THE COURT:  Mr. Fennell and Mr. Tulman.

3              MR. TULMAN:  Good morning.

4              THE COURT:  And then Mr. Adams is over here

5      somewhere.  Mr. Adams and Mr. Henry.

6              MR. HENRY:  Good morning, your Honor.

7              THE COURT:  Good morning to you both.

8              Mr. McCardle and Mr. Ginsberg.

9              MR. GINSBERG:  Good morning.

10             THE COURT:  Good morning.

11             And good morning again.

12             Mr. Hilgers.

13             MS. NICHOLS:  Mr. Hilgers pled this week, your Honor.

14             THE COURT:  Oh, Mr. Hilgers I just saw.  Right.  He

15     just took his plea the other day.

16             Then Mr. Blain and Ms. Newman.

17             MS. NEWMAN:  We are here, your Honor.

18             THE COURT:  Mr. Seth Blain.

19             And Kyle Blain and Mr. Bertan.  Good morning.

20             MR. BERTAN:  Good morning.

21             THE COURT:  Mr. Zuchowski and Mr. Roth.

22             MR. ROTH:  Zuchowski.

23             THE COURT:  Zuchowski.

24             MR. ROTH:  Good morning, Judge.

25             THE COURT:  Good morning.

1              And, Mr. Bachrach, you've got Mr. Young.

2              MR. BACHRACH:  That's correct, your Honor.

3              THE COURT:  Who is just joining us, correct?

4              MR. BACHRACH:  Yes, your Honor.  He was indicted

5    yesterday.

6              THE COURT:  All right.  Very good.

7              If the baby can't keep it down, whoever is with him

8    is going to have to take him outside, or her.

9              Our first order of business, I guess, is to arraign

10   everyone on the S1 indictment, and then --

11             Oh, and Ms. Greenwood.  Where are you?

12             MS. GREENWOOD:  Good morning, your Honor

13             THE COURT:  I didn't mean to leave you out.

14             MS. GREENWOOD:  That's okay.  Thank you.

15             THE COURT:  Then we will talk about discovery and

16   then we will talk about counsel for the newly death-eligible

17   defendants.  And then I know some individual defendants have

18   things they want to raise.

19             First I need to arraign everybody on the S1

20   indictment, except perhaps Mr. Young, who got arraigned

21   yesterday.

22             MR. BACHRACH:  That's correct, your Honor.

23             THE COURT:  All right.

24             Mr. Davis, have you seen a copy of the superseding

25   indictment?

201821davic

1             DEFENDANT DAVIS:  Yes.

2             THE COURT:  Have you reviewed it with your lawyer?

3             DEFENDANT DAVIS:  Yes.

4             THE COURT:  Do you understand what you're charged

5      with?

6             DEFENDANT DAVIS:  Yes.

7             THE COURT:  Ms. Shellow, do you believe your client

8      understands the charges?

9             MS. SHELLOW:  I do, your Honor.

10             THE COURT:  Would you like me to read the indictment

11      aloud or do you waive the public reading?

12             MS. SHELLOW:  I'll waive the public reading.

13             THE COURT:  And how does your client plead?

14             MS. SHELLOW:  Not guilty, your Honor.

15             THE COURT:  Thank you.

16             Mr. Hines, have you seen the superseding indictment?

17             DEFENDANT HINES:  Yes.

18             THE COURT:  Have you reviewed it with your lawyer?

19             DEFENDANT HINES:  Yes.

20             THE COURT:  Do you understand what you're charged

21      with?

22             DEFENDANT HINES:  Yes.

23             THE COURT:  Mr. Palma.

24             MR. PALMA:  Yes, your Honor.  I waive the public

25      reading.  He understands it.

1              THE COURT:  Entering a plea of not guilty?

2              MR. PALMA:  Not guilty, yes.

3              THE COURT:  All right.

4              Mr. Hawkins, have you gotten a copy of the

5    superseding indictment?

6              DEFENDANT HAWKINS:  Yes.

7              THE COURT:  Have you gone over it with your lawyer?

8              DEFENDANT HAWKINS:  Yes.

9              THE COURT:  Do you understand what you're charged

10   with?

11             DEFENDANT HAWKINS:  Yes.

12             THE COURT:  Mr. Miedel, have you gotten to speak to

13   Mr. Hawkins?

14             MR. MIEDEL:  Yes, I have.

15             THE COURT:  Do you think he understands what he's

16   charged with?

17             MR. MIEDEL:  He does.  And he waives a formal reading

18   of the indictment and enters a plea of not guilty.

19             THE COURT:  Thank you.

20             Mr. Simmons, have you gotten a copy of the

21   superseding indictment?

22             DEFENDANT SIMMONS:  Yes.

23             THE COURT:  Have you gone over it with your lawyer?

24             DEFENDANT SIMMONS:  Yes.

25             THE COURT:  Do you understand what you're charged

COMMENTARY

201821davic

1    with?

2              DEFENDANT SIMMONS:  Yes.

3              THE COURT:  And Mr. Orden.

4              MR. ORDEN:  Your Honor, I waive its public reading.

5    I've reviewed it with my client.  I believe he understands.

6    And I ask that a plea of not guilty be entered on his behalf.

7              THE COURT:  Thank you, Mr. Orden.

8              Mr. McLean, have you gotten a copy of the superseding

9    indictment?

10             DEFENDANT McLEAN:  Yes.

11             THE COURT:  Have you gone over it with your lawyer?

12             DEFENDANT McLEAN:  Yes.

13             THE COURT:  Do you understand what you're charged

14   with?

15             DEFENDANT McLEAN:  Yes.

16             THE COURT:  Ms. Cohen.

17             MS. COHEN:  Yes, your Honor.  We waive the public

18   reading of the indictment, and we enter a plea of not guilty.

19             THE COURT:  You're confident your client understands

20   what he's charged with?

21             MS. COHEN:  Yes, ma'am.

22             THE COURT:  Mr. Davis, have you seen the S1

23   indictment?

24             DEFENDANT CHISTOPHER DAVIS:  Yes.

25             THE COURT:  Have you gone over it with your lawyer?

201821davic

1              DEFENDANT CHRISTOPHER DAVIS:  Yes.

2              THE COURT:  Do you understand what you're charged

3    with?

4              DEFENDANT CHRISTOPHER DAVIS:  Yes.

5              THE COURT:  Mr. Bachrach, do you waive the public

6    reading?

7              MR. BACHRACH:  Yes, your Honor.

8              THE COURT:  And do you enter a plea of not guilty?

9              MR. BACHRACH:  Yes, your Honor.  Thank you.

10             THE COURT:  Mr. Frazier, have you gotten the S1

11   indictment?

12             DEFENDANT FRAZIER:  Yes.

13             THE COURT:  You understand what you're charged with?

14             DEFENDANT FRAZIER:  Yes.

15             THE COURT:  Have you gone over it with your lawyer?

16             DEFENDANT FRAZIER:  Yes.

17             THE COURT:  Ms. Shellow, you're waiving the public

18   reading?

19             MS. SHELLOW:  I'm waiving the public reading.  And

20   I'm confident he understands it.  And I would ask that you

21   enter a not guilty plea on his behalf.

22             THE COURT:  Done.

23             Mr. Williams, you've got the S1 indictment?

24             DEFENDANT WILLIAMS:  Yes.

25             THE COURT:  Gone over it with your lawyer?

201821davic

1                    DEFENDANT WILLIAMS:  Yes.

2                    THE COURT:  Understand what you're charged with?

3                    DEFENDANT WILLIAMS:  Yes.

4                    THE COURT:  Mr. Paul, do you think --

5                    MR. PAUL:  Your Honor, Mr. Williams understands the

6    indictment.  We've reviewed it together.  We waive it's public

7    reading.  And he enters a plea of not guilty.

8                    THE COURT:  Thank you.

9                    Mr. Donte Nugent, you've gotten the S1 indictment?

10                   DEFENDANT DONTE NUGENT:  Yes.

11                   THE COURT:  Gone over it with your lawyer?

12                   DEFENDANT DONTE NUGENT:  Yes.

13                   THE COURT:  Do you understand what you're charged

14   with?

15                   DEFENDANT DONTE NUGENT:  Yes.

16                   THE COURT:  Ms. Gauli Rufo.

17                   MS. RUFO:  Yes, your Honor.  I'm confident he

18   understands the nature of the charges.  We would waive a formal

19   reading of the indictment.  And he would enter a not guilty

20   plea to all the charges.

21                   THE COURT:  Thank you.

22                   Mr. Davante Nugent, same question.  Have you seen the

23   S1 indictment?

24                   DEFENDANT DAVANTE NUGENT:  Yes.

25                   THE COURT:  Do you understand what you're charged

201821davic

1    with?

2              DEFENDANT DAVANTE NUGENT:  Yes.

3              THE COURT:  Gone over it with your lawyer?

4              DEFENDANT DAVANTE NUGENT:  Yes.

5              THE COURT:  Mr. Neuman.

6              MR. NEUMAN:  Yes.  I've gone over the indictment with

7    my client.  He understands it.  We waive its public reading.

8    He enters a plea of not guilty.

9              THE COURT:  Thank you.

10             Mr. Lembhard, have you seen S1 indictment?

11             DEFENDANT LEMBHARD:  Yes, ma'am.

12             THE COURT:  Have you gone over it with Mr. Yannella?

13             DEFENDANT LEMBHARD:  Yes.

14             THE COURT:  Do you understand what you're charged

15    with?

16             DEFENDANT LEMBHARD:  Yes.

17             THE COURT:  Mr. Yannella.

18             MR. YANNELLA:  Yes.  I've reviewed the indictment

19    with Mr. Lembhard.  He waives the public reading and enters a

20    plea of not guilty.

21             THE COURT:  Are you confident he understands what

22    he's charged with?

23             MR. YANNELLA:  Yes.

24             THE COURT:  All right.  Very good.

25             Mr. Branch, have you seen the S1 indictment?

201821davic

1              DEFENDANT BRANCH:  Yes.

2              THE COURT:  Gone over it with Mr. Lind?

3              DEFENDANT BRANCH:  Yes.

4              THE COURT:  Do you understand what you're charged

5    with?

6              DEFENDANT BRANCH:  Yes.

7              THE COURT:  Mr. Lind.

8              MR. LIND:  Judge, he waives the public reading, and

9    we request that a plea of not guilty be entered.

10             THE COURT:  And you're confident he understands the

11   charges?

12             MR. LIND:  Yes, Judge.

13             THE COURT:  All right.

14             Mr. Fennell, have you seen the S1 indictment?

15             DEFENDANT FENNELL:  Yes.

16             THE COURT:  Have you gone over it with Mr. Tulman?

17             DEFENDANT FENNELL:  Yes.

18             THE COURT:  Do you understand what you're charged

19   with?

20             DEFENDANT FENNELL:  Yes.

21             THE COURT:  Mr. Tulman.

22             MR. TULMAN:  Your Honor, I've reviewed the indictment

23   with Mr. Fennell and waive the public reading.  He understands

24   the indictment, the charges against him, and he enters a plea

25   of not guilty.

201821davic

1              THE COURT:  Thank you.

2              Mr. Adams, yes have seen the S1 indictment?

3              DEFENDANT ADAMS:  Yes.

4              THE COURT:  Do you understand what you're charged

5    with?

6              DEFENDANT ADAMS:  Yes.

7              THE COURT:  You've gone over it with Mr. Henry?

8              DEFENDANT ADAMS:  Yes.

9              THE COURT:  Mr. Henry, does your client understand

10   the charges?

11             MR. HENRY:  He does, your Honor.  And we waive the

12   public reading and enter a plea of not guilty.

13             THE COURT:  Thank you.

14             Mr. McCardle, have you gotten a copy of the S1

15   indictment?

16             DEFENDANT McCARDLE:  Yes.

17             THE COURT:  Have you gone over it with Mr. Ginsberg?

18             DEFENDANT McCARDLE:  Yes.

19             THE COURT:  You understand the charges?

20             DEFENDANT McCARDLE:  Yes.

21             THE COURT:  Mr. Ginsberg.

22             MR. GINSBERG:  Yes, your Honor.  I've reviewed the

23   charges with my client.  I believe he understands the charges.

24   We waive the public reading.  And he wishes to enter a plea of

25   not guilty.

201821davic

1          THE COURT:  Very good.

2          Mr. Blain, Seth Blain, have you seen the S1

3  indictment?

4          DEFENDANT SETH BLAIN:  Yes.

5          THE COURT:  Have you gone over it with Ms. Newman?

6          DEFENDANT SETH BLAIN:  Yes.

7          THE COURT:  Do you understand what you're charged

8  with?

9          DEFENDANT SETH BLAIN:  Yes.

10          THE COURT:  Ms. Newman.

11          MS. NEWMAN:  I've reviewed the indictment with my

12  client.  He understands the charges.  We would waive a public

13  reading.  And we enter a plea of not guilty on his behalf.

14          THE COURT:  Thank you.

15          Mr. Kyle Blain, have you seen the S1 indictment?

16          DEFENDANT KYLE BLAIN:  Yes.

17          THE COURT:  Have you gone over it with Mr. Bertan?

18          DEFENDANT KYLE BLAIN:  Yes.

19          THE COURT:  Do you understand what you're charged

20  with?

21          DEFENDANT KYLE BLAIN:  Yes.

22          THE COURT:  Mr. Bertan.

23          MR. BERTAN:  Your Honor, I've reviewed the indictment

24  with my client.  I am confident he understands it.  We waive

25  its public reading.  And he enters a plea of not guilty.

1           THE COURT:  Very good.

2           In Zuchowski, have you seen the S1 indictment?

3           DEFENDANT ZUCHOWSKI:  Yes, your Honor.

4           THE COURT:  Have you gone over it with Mr. Roth?

5           DEFENDANT ZUCHOWSKI:  Yes, your Honor.

6           THE COURT:  You understand what you're charged with?

7           DEFENDANT ZUCHOWSKI:  Yes, your Honor.

8           MR. ROTH:  I've reviewed it with my client, and I'm

9    confident he understands the nature of the indictment.  He

10   waives the public reading, and he pleads not guilty.

11          THE COURT:  Thank you, Mr. Roth.

12          And Mr. Young was arraigned on the S1 yesterday?

13          MR. BACHRACH:  Yes, your Honor.

14          THE COURT:  Okay.

15          I forgot to say hi to the government.

16          Hi, Government.

17          MS. NICHOLS:  Good morning, your Honor.

18          MS. COMEY:  Good morning, your Honor.

19          AGENT PETROV:  Good morning, your Honor.

20          THE COURT:  I was so concerned with getting all the

21   defense lawyers right, I skipped right over you.

22          MS. COMEY:  Your Honor, I'll note for the record that

23   with us at counsel table is Special Agent Andre Petrov of the

24   FBI.

25          THE COURT:  Good morning, Mr. Petrov and Ms. Comey

1    and Ms. Nichols.

2            Can you tell me, Ms. Nichols or Ms. Comey, what

3    additional discovery, if any, is occasioned by the S1.

4            MS. NICHOLS:  Yes, your Honor.  We've been working on

5    getting that discovery together, and there is sort of three

6    different buckets of discovery.  There's a little bit that goes

7    to all of the defendants, that is including the defendants who

8    were just charged with the narcotics crimes, and that includes

9    lab reports from controlled buys, it includes records from

10   historical cell site information, it includes some jail calls,

11   and it includes a second wire that was part of a separate

12   investigation.  I would like to put on the record the details

13   of that piece of discovery.

14           There was a separate investigation out of the Bronx

15   from our office in Manhattan, and the target of that is named

16   Crawford.  And one of the defendants in this case was

17   intercepted on that wire.  And it is our belief, based on what

18   we understand about these two separate investigations, that

19   perhaps Mr. Crawford was a supplier to Mr. Hines and Mr. Hines

20   was, in turn, a supplier to some of the defendants here.

21           And so what the government is proposing to do -- we

22   would make available that wire to anyone who wants it, but what

23   we're proposing to do in the first instance is to produce the

24   entirety of the Crawford wire to Mr. Hines, including all of

25   the interceptions, which does include a significant portion of

1     interceptions, actually, after these defendants here were

2     arrested.  And then as to everyone else who really doesn't have

3     any sort of foreseeability as to the rest of the drugs being

4     distributed that were intercepted on the Crawford wire, we

5     would produce the application and all of the written materials,

6     all of the line sheets, and we've also pulled out the line

7     sheets that just relate to Mr. Hines and Mr. Crawford, and then

8     those defendants could make arrangements if they would like to

9     have that copied for them or to come into our office and review

10    the rest of it if they would like.

11              THE COURT:  Well, let me ask a logistical question.

12    We have Ms. Greenwood.  Wouldn't the simplest thing be to

13    produce everything to her and then whoever wants pieces of it

14    can get it from her?

15              MS. NICHOLS:  We can certainly do that.

16              THE COURT:  Usually the government likes to just deal

17    with one lawyer.  I know she's not serving as a lawyer here,

18    but like likes to deal with one person.

19              MS. NICHOLS:  We can certainly do that, your Honor.

20    We thought that the way that we were proposing would be a

21    little bit easier because we thought that perhaps no one

22    besides Mr. Hines would be interested in that.  However, we're

23    happy to produce it to Ms. Greenwood and let them sort it out

24    with her directly.

25              THE COURT:  Did I speak too soon, Ms. Greenwood?

1              MS. GREENWOOD:  No.  That's just fine, your Honor.

2     As long as the government's position is that it is global and

3     that any defendant can request the discovery, I'm happy to

4     coordinate it in that manner.

5              THE COURT:  You were just trying not to overwhelm the

6     defendants who really have no interest in it.

7              MS. NICHOLS:  The concern is that it might -- just

8     because any time that Ms. Greenwood needs to copy something, it

9     takes longer, there's more things in it.  So we were just

10    trying to move more expeditiously with the rest of the

11    discovery.  But we're happy to give it to her and let her sort

12    it out with them.

13              So, in addition, there is --

14              THE COURT:  Are we still in the first bucket?

15              MS. NICHOLS:  No.  We're in the second bucket now.

16              THE COURT:  Okay.  Now we're in the second bucket.

17              MS. NICHOLS:  So the second bucket applies, we

18    believe, to the racketeering defendants.  Of course, if any of

19    the defendants were charged in the narcotics conspiracy and not

20    in any of the racketeering or violent offenses would like that,

21    they can discuss that with Ms. Greenwood.  We don't have a

22    problem with them having it.  We just don't think it applies to

23    them.  So that includes some additional Facebook returns and it

24    includes a number of different types of materials related to

25    violence.  So as to various shootings, there are police

1    reports, ballistics and firearms reports.  And as to the murder

2    files, there is that as well.  And then there is also some

3    surveillance footage, some autopsy photos and crime scene

4    photos and other materials of that nature.

5           So the third bucket is some additional surveillance

6    video, which is about two terabytes worth of video.

7           THE COURT:  That sounds like a lot.

8           MS. NICHOLS:  Yes, your Honor.

9           So that relates to the Valentine's Day shooting.  And

10   my understanding is that the reason why it's so voluminous is

11   that the police pulled several hours, or perhaps even more than

12   that, around the incident in question.  And so we are prepared

13   to produce all of that to Ms. Greenwood and, again, let her

14   decide -- or let each defendant decide whether they want that

15   video.  So we know that not every person who's charged in the

16   racketeering was at that incident and, indeed, some of them

17   were already incarcerated at the time that that shooting took

18   place.  So we're contemplating that each defendant could work

19   out with Ms. Greenwood whether they are interested in -- I

20   think maybe it is more than hours, and it might be days, and

21   that's why it's voluminous.

22           THE COURT:  I assume it's because it's a whole slew

23   of different cameras.

24           MS. NICHOLS:  There are a number of different

25   cameras, yes, your Honor.

1                    THE COURT:  Okay.

2                    MS. NICHOLS:  And I think it is highly likely that a

3       lot of that video footage is not going to be particularly

4       helpful, but because the government has it and because the

5       government can't anticipate what might or might not be helpful

6       to defense counsel, we're prepared to produce all of that.

7                    THE COURT:  Okay.

8                    MS. NICHOLS:  And the police reports will help them

9       narrow the time, of course, that the shooting took place, but

10      we were not prepared to cut off a particular time and say that

11      before or after this particular time they don't need to see, so

12      we're producing everything that we have.

13                   THE COURT:  You're producing everything that the

14      police pulled.

15                   MS. NICHOLS:  Yes.

16                   THE COURT:  And I take it that, when you produce the

17      video file, it will be clear what the location of the camera

18      is.

19                   MS. NICHOLS:  The cameras are labeled in the way that

20      they were labeled.  I think one is called camera three and one

21      is called camera four.

22                   THE COURT:  So how are the lawyers supposed to know

23      where the cameras located?

24                   MS. NICHOLS:  I believe there's a report that will be

25      produced with the racketeering conspiracy bucket of discovery

1    that indicates where the cameras were pulled from.  They're

2    lead reports from the police that indicate which cameras

3    correspond to what businesses and locations in the vicinity.

4              THE COURT:  All right.  But this is not going to be

5    like a pole camera, where there's months of stuff to review?

6    This is all in basically the day before and the day after.

7    It's just a lot of different angles.

8              MS. NICHOLS:  Correct, your Honor.

9              THE COURT:  All right.  Okay.  Well, this may have

10   some effect on our schedule.  That may be an understatement.

11             MS. NICHOLS:  So there's one more category, your

12   Honor, which is individual discovery.  So, for many of the

13   defendants, that is not really anything.  There's marshal

14   intake forms for everyone.

15             THE COURT:  Don't they already have all that?

16             MS. NICHOLS:  Well, the marshal intake forms probably

17   should have gone out last time, but didn't, so they will go out

18   this time.

19             For a number of defendants, there are phone

20   extraction reports.  And so what the government is

21   contemplating doing is producing those phone extraction reports

22   to each defendant whose phone it is in individual discovery.

23   As we continue to -- or as we begin and then continue to review

24   those extraction reports, we will be pulling out any Rule 16

25   and distributing it to the group, but, in the first instance,

1    due to the sensitive nature of a personal phone, we're

2    producing those as individual discovery.

3            THE COURT:  Any other individual discovery?  Just the

4    marshal paperwork and the phone extractions?

5            MS. NICHOLS:  For most people, that's what it is,

6    your Honor.

7            THE COURT:  And do you have phone discovery for

8    everybody or just a handful?

9            MS. NICHOLS:  It's somewhere in between, your Honor.

10   Not everyone had a phone when they were arrested.  Some people

11   had multiple phones.  There were 34 phones seized incident to

12   arrest as part of the case, but they did not come from each

13   defendant.  They came from some and not all.

14           THE COURT:  They came from --

15           MS. NICHOLS:  Some of the defendants, but not all of

16   them.

17           THE COURT:  So some had more than one phone.

18           MS. NICHOLS:  Correct, your Honor.

19           THE COURT:  Okay.  So that's a lot of phone

20   extractions.

21           All right.  Well -- I'm just looking at what I said

22   last time.  I probably said definitely setting a schedule for

23   motions and such.  But this may put things in a different

24   light.

25           Let me ask Ms. Shellow, because you seem to have been

```
 1    communicating with co-counsel, what the -- well, let me state
 2    the obvious, too.
 3              There are three defendants with death-eligible
 4    charges, correct?
 5              MS. NICHOLS:  There's four, your Honor.
 6              MS. SHELLOW:  Four.
 7              THE COURT:  Four.  I'm sorry.  So that's Mr. Davis,
 8    Mr. Hawkins.  And who are the other two?
 9              MS. NICHOLS:  Fennell.
10              MS. SHELLOW:  Fennell and Mr. Young.
11              MR. TULMAN:  My client, your Honor, Mr. Fennell.
12              THE COURT:  Mr. Fennell and --
13              MR. BACHRACH:  And Mr. Young, your Honor.
14              THE COURT:  And Mr. Young.  All right.
15              We will talk in a moment about their representation
16    and all that, but they, obviously, have now a new and different
17    front on which they're going to be fighting.
18              Hold on one second.
19              (Pause)
20              THE COURT:  Ms. Shellow, have you had the opportunity
21    to survey your brothers and sisters and see what they have in
22    mind?
23              MS. SHELLOW:  I have surveyed some of them, your
24    Honor.  And I would suggest, for all of the group that are not
25    capital defendants, although they may want a different
```

1    spokesperson, at least 90 days given the representations by the

2    government of the volume of additional discovery.  And that

3    would be 90 days they would come back and then identify motions

4    and set a schedule.

5            THE COURT:  Do all the noncapital defendants think

6    that's reasonable?  Let's put it this way.  Any noncapital

7    defendant object to that?

8            MR. LIND:  Well, my client would like to move sooner

9    than that, Judge.  I don't know if that's in his best interest,

10   but I just want to raise that with the Court.  I represent

11   Paradise Branch.

12           THE COURT:  And is he in the racketeering or is he

13   just in the drug conspiracy?

14           MR. LIND:  He's in the racketeering.

15           THE COURT:  So there's going to be a lot of new

16   discovery coming his way.

17           MR. LIND:  I understand that.  I'm just voicing what

18   his position is, Judge.

19           THE COURT:  All right.  I understand.

20           MR. YANNELLA:  Your Honor, Donald Yannella for Calvin

21   Lembhard.

22           My client is sitting next to the individual who just

23   made that application, and he wants me to join it.  He's also

24   in the racketeering count, Count One of the indictment.  So I'm

25   going to have some new discovery to deal with.  But he's asking

1    me to voice the objection, also, or join the application.

2              MS. NEWMAN:  Your Honor, Donna Newman on behalf of

3    Seth Blain.

4              On the other hand, your Honor, we would respectfully

5    request the 90 days to review all the discovery.

6              THE COURT:  Well, I think 90 days is reasonable.

7              MR. NEUMAN:  Judge, I'm sorry to interrupt.  My

8    client I think wants me to make a record, also.

9              James Neuman for Davante Nugent, Judge.

10             I believe he wants a faster schedule as well.  He's

11   also in the racketeering count.

12             THE COURT:  Well --

13             MS. RUFO:  Your Honor, Lorraine Gauli Rufo on behalf

14   of Donte Nugent, who has also expressed that he would like to

15   have a quicker schedule as well.

16             THE COURT:  Well, I understand completely why the

17   defendants are getting antsy.  However, there's a new

18   indictment.  There's new charges.  There's new discovery.  The

19   lawyers only have so many hours in the day.  And the majority

20   of the -- the vast majority of the defendants are okay with it.

21   And there's been no severance.  And I'm not going to sever just

22   for that reason.  And, further, I haven't heard any of the

23   lawyers for the clients who object to 90 days telling me that

24   they don't think they need the 90 days.  So I think that 90

25   days is reasonable given the volume and given the changes that

1    have come down with the S1.  So I will ask Ms. Cama to look for

2    a date in about three months time.

3              In the meantime, we need to talk about the

4    representation of the four defendants who are now death

5    eligible.

6              MR. GINSBERG:  Your Honor, before we move onto that.

7    Lee Ginsberg.  It seems to me that there's a separate, but

8    related issue as to discovery that we need to sort out sooner

9    rather than later.

10             Based on what the government said, it seems like a

11   lot of discovery that they're now turning over may not relate

12   to quite a number of the defendants in this case.  For example,

13   my client's in the narcotics conspiracy and, based on what they

14   said, I might not need to review it.  However, we don't know

15   now whether there's going to be a trial; if there is a trial,

16   whether any of that discovery -- the material that makes up

17   that discovery is going to be something that could conceivably

18   be used at trial as part of a larger conspiracy or somebody

19   else's conduct that's admissible against that person.

20             And I know those are in limine motions; however, if

21   we don't know now what the groupings are going to be and

22   whether that's going to be important or not, I don't -- for

23   example, I don't review the discovery because I don't think,

24   based on what was said, I need to.  We have a motion schedule.

25   I don't see a need to make motions.  My client decides to go to

1   trial and now, all of a sudden, six months from now, a year

2   from now, some of that material -- the government will argue

3   that some of that material is admissible in the conspiracy or

4   in the racketeering.  We wouldn't have -- I wouldn't have

5   reviewed it because of what's being said today.  On the other

6   hand, it may end up becoming relevant.

7           And I think one of the ways to deal with that -- I

8   think your Honor mentioned something about severance.  One of

9   the ways to deal with that is really to begin as soon as

10  possible to see if there's a way to break up the indictment and

11  the groups in the indictment because of this what seems to be

12  vast amount of discovery that may relate to only some portion

13  of the defendants.

14          THE COURT:  Well, obviously, at some point, we're

15  going to have to whack it up if more than ten defendants want a

16  trial.  And we may have to whack it up sooner because the

17  death-eligible defendants are going to have to go through a

18  process and will have a -- so I wouldn't be surprised if they

19  got severed at some point.  Whether the non-racketeering

20  defendants get severed from the racketeering defendants, I

21  mean, it's entirely possible, depending on how many want to go

22  to trial, but I think it's a little premature.  I guess I'm not

23  prepared to say now don't worry about it, you're not going to

24  trial with a racketeering defendant.  You might well.

25          MR. GINSBERG:  I understand.  That's why I raised it,

1   because it's conceivable that I'm going to -- I and maybe

2   others will be in a position where we didn't feel it necessary

3   to review all this new discovery and then it does become

4   necessary because of the way the groupings were or who goes to

5   trial with whom and what the government argues is admissible.

6           THE COURT:  Well, I think you need to assume the

7   worst.

8           MR. GINSBERG:  Well, then the point -- that's why I

9   wanted to raise that, because then, regardless of what the

10  government is now saying about how the new discovery affects

11  particular defendants in particular groups, we still need,

12  apparently, to review all of it.

13          THE COURT:  Well, no.  You may or may not.  You need

14  to make the judgment you always make as a lawyer --

15          MR. GINSBERG:  Yes.

16          THE COURT:  -- whether or not you need it.  But if

17  there's an act of violence that your client was in jail for and

18  there's no indication he was aware of it or participated, then

19  you don't, or if there are buys that don't involve your guy or

20  anybody he knew, you know, you don't need to.

21          But, yeah, I mean, it's entirely possible that, when

22  it comes down to it, depending on how many people want a trial,

23  it may be that somebody who's involved in an act of violence is

24  going to trial with somebody who is only involved with drugs or

25  it's entirely possible I will sever down the line either for

1    management reasons or for other reasons.  But I don't want

2    anybody to think, when they're thinking about their motions,

3    that they're necessarily going to be going to trial only with

4    other defendants who are charged like them.  That may or may

5    not happen.

6              Also, with the death-eligible defendants, if we get a

7    quick no seek, then maybe they will be going to trial with

8    other people, too.  I don't know if there is such a thing as a

9    quick no seek nowadays, but I think -- I'm encouraging the

10   government to do what it can to pair down the census here in

11   the next 90 days because I do think, either at the next

12   conference or very soon thereafter, I'm going to have to start

13   whacking up people for trial.  And, look, the obvious split is

14   the non-racketeering defendants, the racketeering defendants

15   and the murder defendants.  But it may be that we don't need to

16   break it into three.  Make we can break it into two.  But with

17   this many lawyers and the need to set trial dates so far in

18   advance, if it's not going to be at the next conference, it's

19   going to be very soon thereafter.  And that's apart from

20   whatever severance motions the defendants may want to make.  As

21   we know, those are often long shots, but often they get what

22   they want, anyway, just because of logistics.

23             So if you're going to be making deals, make them now.

24             MR. ORDEN:  Your Honor, if I may.

25             THE COURT:  Yes, Mr. Orden.

1          MR. ORDEN:  Thank you.  Stewart Orden on behalf of

2    Michael Simmons.

3          And I don't know whether this clarifies anything,

4    but, as I listened to the government speak about bucket one and

5    I think it was bucket three, there was a suggestion, but not a

6    concession in the way they portrayed the new discovery that

7    relates to two individual defendants that, basically, it was

8    irrelevant.  If we wanted to get it, we could get it, we could

9    look at it, but it was irrelevant to the other named

10   defendants.  And I think --

11         THE COURT:  Is this the Valentine's Day shooting?  I

12   mean, you guys know a lot more about this than I do.  Who is

13   charged with that shooting?

14         MS. NICHOLS:  Your Honor, William Fennell and Troy

15   Young are charged with that, your Honor.

16         THE COURT:  Okay.  And that was in the category of --

17         MS. NICHOLS:  Well, there is --

18         THE COURT:  -- anyone can have it if they want it.

19         And that's an act of racketeering, I assume.

20         MS. NICHOLS:  Yes, your Honor.

21         Maybe I wasn't clear.  There is a lot of material

22   related to the Valentine's Day shooting that we anticipate will

23   and should go out to all of the racketeering defendants.

24         THE COURT:  That's part of bucket two.

25         MS. NICHOLS:  Yes, your Honor.

1    There is also two terabytes of video footage.

2    THE COURT:  That's bucket three.

3    MS. NICHOLS:  That's separate.  And so, because it

4    takes a long time to copy two terabytes of video footage,

5    Ms. Greenwood and the government have agreed that we would put

6    that on a separate drive.  And because some of the racketeering

7    defendants who may want to review all of the discovery about

8    all of the racketeering defendants were in jail when that

9    shooting took place, they may not want to review the

10   surveillance footage.  They know that they're not on it.

11   THE COURT:  That makes sense to me.

12   MR. LIND:  Judge, Richard Lind.

13   MR. ORDEN:  I'm not done.

14   MR. LIND:  Oh, I'm sorry.

15   MR. ORDEN:  So is there a concession from the

16   government that that which is contained in bucket one, which is

17   the wiretaps, and that which is contained in the video in

18   bucket three, where our clients are not involved, is irrelevant

19   evidence either at sentencing or at trial?

20   MS. NICHOLS:  Absolutely not.

21   MR. ORDEN:  Otherwise, I don't know how to make a

22   decision here.

23   THE COURT:  I didn't hear anything like that at all.

24   I heard them say that bucket one is going to everybody,

25   including that other wiretap, and it relates primarily to

1    Mr. Hines, but anyone can look at it, and that the surveillance

2    video, likewise, is available to anyone else, but it primarily

3    presumably relates to the two defendants who are involved in

4    that shooting.  And I didn't hear them say it was irrelevant.

5         But you, as a lawyer, will do what you do in all your

6    cases, and you will make a decision about whether it's a good

7    use of your time to look at surveillance footage of a shooting

8    your client wasn't involved in and/or what portions of that

9    wire to listen to.  And this is just like any other judgment

10   call that you, as an attorney, are entitled to make.

11        MS. COMEY:  Your Honor, if I could just note for the

12   record those buckets that we set out and the clarification of

13   what may be relevant to others was simply meant as a courtesy

14   to help defense counsel as they review voluminous discovery.

15   That is what it is meant to be.

16        THE COURT:  I took it as the government's view of

17   what the government thinks the defense lawyers will be

18   interested in.  But it's certainly not binding on -- the

19   defense lawyers don't have to agree.  And I certainly didn't

20   hear the government saying that it was making any sort of

21   commitment as to relevance or use against any particular

22   defendant.

23        Right now, Mr. Davis, Mr. Fennell and Mr. Young have

24   lawyers who are not on the Capital Panel.

25        MR. BACHRACH:  No, your Honor.  I'm on the Capital

1    Panel.

2              THE COURT:  Oh, you are?

3              MR. BACHRACH:  Yes.

4              THE COURT:  Well, that's convenient.

5              MR. BACHRACH:  I believe that's why I got called,

6    your Honor.

7              THE COURT:  Oh, so you're here on short notice, too.

8    Thank you.

9              Mr. Bachrach is on the Capital Panel and Mr. Miedel

10   is on the Capital Panel.

11             And you will both, obviously, be conferring with

12   Mr. Patent about learned counsel, and I'm sure I will hear from

13   him.

14             MR. BACHRACH:  And, your Honor, both of us have

15   already e-mailed Mr. Patent and hopefully will be speaking to

16   him tomorrow.

17             THE COURT:  Very good.

18             So I'm going to address myself to Mr. Davis and

19   Mr. Fennell.

20             Where are you Mr. Fennell?  There you are.  All

21   right.  So let me explain something which your lawyer may have

22   already explained, but I need to explain it as well.

23             You're now both charged with offenses that carry a

24   potential sentence of death.  The government does not

25   necessarily seek such a sentence in every case.  Sometimes it

1      does.  Often it doesn't.  But every case is different.  So it's

2      entirely possible they will seek such a sentence in this case

3      and, accordingly, you now, as I said a moment ago, have two

4      fronts on which to fight.  One is the one that's been here all

5      along, which is to fight the charges, or not, depending on what

6      you think is in your best interest, but the second one, the new

7      one, is to try to persuade the government not to seek the death

8      penalty.

9              Because you are charged with an offense that carries

10     a potential sentence of death, you are entitled to two lawyers.

11     We call one your lead counsel and one your learned counsel.

12     The learned counsel is a lawyer who is experienced in

13     death-eligible cases and specializes in that sort of work.  And

14     regardless of who your lead lawyer is, you will get a learned

15     counsel on your case.

16              Right now, Mr. Davis, your lead lawyer is

17     Ms. Shellow.

18              And, Mr. Fennell, yours is Mr. Tulman.

19              Because you're now charged with a death-eligible

20     case, you're entitled, if you want, to swap out your current

21     lawyer for a lawyer from the Southern District Capital Panel.

22              So our Criminal Justice Act Panel, which supplies

23     lawyers for defendants who can't afford lawyers, has one big

24     panel, scores of -- dozens of lawyers on it, and then we have a

25     smaller panel of a subset of those lawyers who also are

1    experienced in death-eligible cases.  And you are entitled to a

2    lead lawyer from our Southern District CJA Panel who is on the

3    Capital Panel because experienced and skilled in death-eligible

4    cases as well as learned counsel.  You also have the option, if

5    you would like, to keep your current lawyer, and you'll still

6    get learned counsel.

7              This is something you should discuss with your

8    lawyer, if you haven't already, and you should think through.

9    Some defendants in your case, if they have a relationship and a

10   good feeling with the lawyer that they have, they decide they

11   want to keep that lawyer.  Even though that lawyer is not on

12   the Capital Panel and doesn't have the experience in capital

13   cases, they still want to keep that lawyer as their lead

14   counsel.  Other defendants say, no, I want a lawyer who's on

15   the Capital Panel, who's experienced in these kinds of cases.

16             I'm only talking about the lead-counsel position.

17   Either way, you're going to get learned counsel.

18             Ms. Shellow, have you had the opportunity to discuss

19   this issue with Mr. Davis?

20             MS. SHELLOW:  I have, your Honor.

21             THE COURT:  And is he prepared to make a decision or

22   does he want more time to think?

23             MS. SHELLOW:  I believe he's prepared to make a

24   decision, your Honor.

25             THE COURT:  Have you had enough time to -- well,

1    first of all, have you discussed this with Ms. Shellow before

2    today?

3              DEFENDANT SKYLAR DAVIS:  Yes.

4              THE COURT:  And have you had enough time to think

5    this over?

6              DEFENDANT SKYLAR DAVIS:  Yes.

7              THE COURT:  It's a big decision.

8              Do you know what you would like to do?  Do you want

9    to keep Ms. Shellow or would you like to swap her out for

10   somebody from the Capital Panel who has experience in

11   death-penalty cases?

12             DEFENDANT SKYLAR DAVIS:  Yes, I'll keep her.

13             THE COURT:  You want to keep Ms. Shellow?

14             DEFENDANT SKYLAR DAVIS:  Yes.

15             THE COURT:  And as I said, either way, you're going

16   to get another lawyer who's experienced in capital cases.

17             Do you understand that you have a right to have a

18   lawyer replace Ms. Shellow who's experienced in cases like

19   yours, where the death penalty is a possible punishment?

20             DEFENDANT SKYLAR DAVIS:  Yes.

21             THE COURT:  And you understand that, if you decide to

22   keep Ms. Shellow, you're not going to be able to complain later

23   on, if you're unhappy how things turn out, that your rights

24   were violated by not having a lawyer from the Capital Panel?

25             DEFENDANT SKYLAR DAVIS:  Yes.

1          THE COURT:  And have you understood everything I've

2   said today?

3          DEFENDANT SKYLAR DAVIS:  Yes.

4          THE COURT:  And it's your decision that you would

5   like to keep Ms. Shellow and have her joined by somebody who's

6   learned counsel?

7          DEFENDANT SKYLAR DAVIS:  Yes.

8          THE COURT:  Anybody think I should ask any further

9   questions of Mr. Davis?

10          MS. NICHOLS:  Nothing from the government, your

11   Honor.

12          MS. SHELLOW:  No, your Honor.  I think it's

13   sufficient.

14          THE COURT:  All right.

15          Mr. Fennell, have you had an opportunity to discuss

16   this issue with Mr. Tulman?

17          DEFENDANT FENNELL:  Yeah, I did.

18          THE COURT:  Actually, I should ask you, Mr. Tulman.

19          Have you had an opportunity to discuss this issue

20   with Mr. Fennell?

21          MR. TULMAN:  I have, your Honor.  I believe that my

22   client would be inclined to keep me, but, because of the

23   seriousness of this matter, I would like an opportunity to meet

24   with him again and just think about things that I may not have

25   thought of in our initial meeting on the subject.

1           THE COURT:  All right.

2           Well, Mr. Fennell, sounds like Mr. Tulman wants to

3   sit with you again and talk about this, and that's a prudent

4   thing to do.  Why don't we do this.

5           Well, at this point, let me ask you, Mr. Fennell,

6   have you understood what I've been discussing this morning?

7           DEFENDANT FENNELL:  Yes, I do.

8           THE COURT:  And do you understand that, because

9   you're now charged with a death-eligible case, you will be

10  getting a learned counsel in addition to your lead counsel?

11          DEFENDANT FENNELL:  I understand.

12          THE COURT:  And do you understand that your lead

13  counsel, Mr. Tulman, is not on the Capital Panel; in other

14  words, not on the roster of CJA lawyers who specializes in

15  capital cases?

16          DEFENDANT FENNELL:  Yeah, I understand.

17          THE COURT:  And do you understand that you're

18  entitled to swap him out for a lawyer who is on the Capital

19  Panel and does have that experience in capital cases?  In other

20  words, that you have the right to swap him out for a lawyer on

21  the Capital Panel if you so choose.

22          DEFENDANT FENNELL:  Yeah, I understand.

23          THE COURT:  And do you understand you also have the

24  right to keep Mr. Tulman as your lawyer if you would like?

25          DEFENDANT FENNELL:  I understand.

1               THE COURT:  All right.  And I think it's wise to take

2      some more time to talk about it and to think about it.

3               Is it fair, Mr. Tulman, to say that you will let me

4      know in a week's time?

5               MR. TULMAN:  Certainly, your Honor.  I'm going to go

6      speak with him tomorrow about this.

7               THE COURT:  All right.

8               Does anybody think that I need to have Mr. Fennell

9      back in to get his decision on the record or is a letter from

10     Mr. Tulman sufficient?

11              MS. NICHOLS:  We could just have him come back in,

12     your Honor, just to make sure that -- you could ask the same

13     questions and he could give those responses.

14              THE COURT:  All right.  It's probably safe.

15              Then why don't we do this.  Let me ask Ms. Cama to

16     find a time not next week, but the week after.

17              You'll send me a letter in a week.  If your client's

18     choice is he does want to swap out for Capital Panel counsel,

19     it will give me a little time to find somebody.

20              MR. TULMAN:  Certainly, your Honor.

21              THE DEPUTY CLERK:  February 15th, 2:30.

22              MR. TULMAN:  Your Honor, I think I'm going to -- I

23     know.  I don't think.  I am going to be out of town at that

24     time.  I'm returning on February 16th.  Would February 20th be

25     a good day for the Court?

1       THE COURT:  I'm sure we can squeeze it in.

2       THE DEPUTY CLERK:  February 20th, 3:00.

3       MR. TULMAN:  That's fine, your Honor.

4       THE COURT:  All right.  I didn't ask you,

5  Ms. Nichols, what your plans are for discovery at the jails.

6       MS. NICHOLS:  So, your Honor, we are prepared today

7  to begin burning the copies for Ms. Greenwood of the discovery

8  that I just mentioned.

9       As the Court probably recalls, there has been a

10  protective order in place in this case since the beginning.

11  The first version of the protective order was violated and

12  discovery materials were placed online and, following that, the

13  parties had discussed a new protective order, which your Honor

14  entered in December.  So we are looking for signature pages

15  from each of the defendants and the attorneys in the case.

16  Before we will be able to produce the discovery to the jails,

17  we will need the signature pages from all of the defendants at

18  that jail to ensure that everyone understands what the

19  protective order requires and does not permit.  We are missing

20  signature pages from Mr. Frazier and Mr. Hawkins at this time,

21  and their respective attorneys.  So all of the attorneys who

22  have signed, Ms. Greenwood may release the discovery to them,

23  but the discovery will not be produced to the defendants until

24  all have signed.

25       If I may, I would like to just say for the record

1   what the restriction is so there's no confusion.

2            The discovery material cannot be disclosed either by

3   the defendant or by the defendant's counsel to anyone other

4   than persons who are working for the attorney for that

5   defendant and a potential witness.  And, additionally, the

6   defendants are not permitted to retain paper copies of most of

7   the discovery in their cells.

8            So the discovery is being provided electronically.

9   If attorneys want to print paper copies to review with the

10  defendants, they are certainly free to do so, but they must

11  take those paper copies with them and cannot leave them with

12  the defendants in the jail.  As with the last protective order,

13  this material cannot be posted to Facebook, it cannot be posted

14  to the internet, and it cannot be disclosed to third parties.

15           So the government will work with Ms. Greenwood for

16  the production to the jails.  And we anticipate that, when the

17  signature pages are received, then we will be able to get that

18  out.

19           THE COURT:  All right.

20           MS. NEWMAN:  Your Honor, if I might.  I just want to

21  clarify.

22           Donna Newman on behalf of Seth Blain.

23           And I know that I had discussed this previously, but

24  now that we're clarifying, I want to be sure that it's clear.

25  The discovery for Mr. Blain has been put on Dropbox, which is

201821davic

1    protected by who we distribute it to.  It has a password, but

2    it is through the internet.  And I wanted to be clear that that

3    was still something that we can continue to do.

4              THE COURT:  It's not public.

5              MS. NEWMAN:  Mr. Blain is out, but he knows that he

6    cannot then take that and reproduce it.  And I think that was

7    the portion that they were looking for.  But since it was a

8    general internet, I wanted to clarify.

9              THE COURT:  That's okay, right?

10             MS. NICHOLS:  That's fine.  Thank you, your Honor.

11             THE COURT:  Yes.  The government agrees that's okay.

12             MR. BERTAN:  And on before of Kyle Blain, he reviews

13   the same batch of discovery.

14             THE COURT:  Yes.  As long as it's password protected

15   and can't be public, I don't consider it "posted."

16             MR. BACHRACH:  Your Honor, just an added complication

17   for Mr. Young I wanted to make you aware of.

18             Because Mr. Young is a paraplegic, he will not be

19   housed in a traditional prison.  Instead, it's my understanding

20   he's going to be housed in a medical facility.  For security

21   reasons, the marshals I know don't want me to say which one

22   because it's not a prison.  It's basically a hospital.  That

23   could cause some delays in getting him the discovery because we

24   will also need to get him a laptop, which can only be obtained

25   through the National Litigation Support Office.  At least,

1   that's my understanding of how it works.

2           So I'm going to be making every effort to get that

3   done as quickly as possible, but just an added step for

4   Mr. Young since he will be in a hospital as opposed to a

5   prison.

6           THE COURT:  If I need to sign anything, let me know.

7           MR. BACHRACH:  Thank you, your Honor.

8           MS. NEWMAN:  Donna Newman on behalf of Seth Blain.

9           With respect to the computer issue, as the Court may

10  be aware, may recall, I had made application directly to the

11  Court.  The Court directed me to the Federal Defenders in the

12  National Litigation.  I, after much ado, have received notice

13  from them that, in fact, they don't have computers to give out.

14  And they have instructed me to purchase my own computer for

15  Mr. Blain that would also be available, obviously, for Mr. Kyle

16  Blain and that that computer, which I would be reimbursed,

17  would be the property of the National Litigation and, after

18  this, would need to be returned.  In fact, they gave me

19  specifications on the nature of the computer that I should

20  purchase I guess because then it would be universal, have more

21  applicability, although, for my case, I would need less of a

22  computer.

23          THE COURT:  So you're supposed to buy one.  They're

24  going to reimburse you.  And when the case is done, you're

25  going to send it to them.

201821davic

1              MS. NEWMAN:  That's correct.

2              And so I would request, because the Court had ordered

3    me to go through National Litigation, that, in fact, I will

4    have filed today a new letter, and I would request that the

5    Court sign it, allowing me now, based on that latest

6    information, to purchase it.

7              THE COURT:  Fine with me for you to do whatever the

8    folks in Washington have told you to do.

9              MS. NEWMAN:  Thank you.

10             THE COURT:  Same with you, Mr. Bachrach.

11             MR. BACHRACH:  Thank you, your Honor.

12             MS. SHELLOW:  Your Honor, lastly, on behalf of

13   Mr. Frazier, whose lawyer has not signed the protective order

14   because he is not here, I have texted him to inquire whether I

15   may sign on his behalf.  If he so gives me permission, will you

16   permit me to sign for Mr. Epstein so that the discovery can be

17   promptly distributed to the clients?

18             THE COURT:  That's all right with me.  You can catch

19   up with Mr. Epstein after.

20             MS. NICHOLS:  Certainly, your Honor.

21             It's not logistically difficult to get the signature

22   pages from the attorneys.  It's more so from their clients.  So

23   if in Frazier would like to sign today --

24             THE COURT:  I think the best thing is to deal with it

25   while we're all in the same building.

1          MS. SHELLOW:  Mr. Frazier has signed.

2          THE COURT:  And, Mr. Miedel, you may not have had a

3  chance to talk to Mr. Hawkins about it, but maybe --

4          MR. MIEDEL:  Well, your Honor, I just met Mr. Hawkins

5  today.  I do want some additional time to talk to him about it.

6  I'll be seeing him in the next few days.  And I'll get the

7  signature page to the government within three, four days.

8          THE COURT:  Very good.

9          MR. TULMAN:  Scott Tulman.

10          Your Honor, my client, Mr. Fennell, is housed in

11  Valhalla.  The coordinating discovery attorney has been able to

12  send disks to the MDC and the MCC.  My client is more in need

13  of those disks, given the superseding indictment, than anyone

14  right now.  I'm told by Ms. Greenwood that an order would be

15  required from the Court to allow Ms. Greenwood to send disks in

16  to Valhalla, to my client, so that he can review discovery in

17  this case.

18          THE COURT:  I thought, Valhalla, you can't have

19  disks.

20          MS. GREENWOOD:  Your Honor, my understanding is that

21  their policy, while it used to be that defendants there

22  routinely would receive disks directly, though, from the

23  government, that they have since shifted their policy and now

24  routinely receive hard drives.

25          My question for defense counsel, which I discussed

1    with them this morning, was, to the extent that the facility

2    has computers that would allow to read disks, my office can

3    certainly provide disks to those defendants at Valhalla, but I

4    would need a Court order to do so.

5            So perhaps I can reach out to the facility after this

6    conference.  I speak regularly there with the Deputy

7    Commissioner.  I can have a frank conversation with him about

8    the extent of the discovery in this matter.

9            THE COURT:  You can tell him truthfully that I would

10   like to make sure the defendants have as much access to it as

11   possible.  And if I need to sign an order, I will.  I don't

12   want to do anything that presents a security problem, but I

13   hope that they will be able to work with you on that.

14           MS. GREENWOOD:  Yes.  And on a practical level, too,

15   I wanted to make sure that there are, indeed, computers on

16   which to review the disks, of course, so I will take care of

17   that.

18           THE COURT:  I don't think that there are as many as

19   would be ideal, but I think there are.

20           All right.  I know, Mr. Yannella, you have a matter

21   you want to take up, but can we let everybody else go?

22           UNIDENTIFIED SPEAKER:  We don't have a date, your

23   Honor.

24           THE COURT:  Oh.  Right.  Good point.

25           MR. YANNELLA:  Judge, can I just ask for some

1    clarification on the meaning of disclosure in this order.

2              So I understand, in the protective order, I can't

3    even show my client's family a copy of the video.

4              MS. COMEY:  That's our interpretation of the order,

5    your Honor.  Third parties cannot see discovery material.

6              THE COURT:  Unless they're potential witnesses to

7    what's on the video.

8              MR. YANNELLA:  Judge, would you entertain individual

9    applications?

10             I think that when defendants' families understand

11   what the evidence is against them --

12             THE COURT:  Well, if you --

13             MR. YANNELLA -- it can be helpful.

14             THE COURT:  Well, let me ask you, Ms. Comey.  I

15   wouldn't authorize distribution of the material to a family

16   member, but let's say a family member is in Mr. Yannella's

17   office and Mr. Yannella wants to show the family member what

18   the defendant's up against.

19             MS. COMEY:  We would ask for an individual

20   application to your Honor on a case-by-case basis.

21             Our concern is that the breach of the protective

22   order that led us to this moment was by a family member of one

23   of these defendants.

24             THE COURT:  Well, the answer is, yes, I will

25   entertain an individual application.  Naturally, you should

1   speak to the government first.  And if what you're looking to

2   do is show it in your office to the defendant's mother, I doubt

3   they'll have a problem with it, unless they have some reason to

4   mistrust the defendant's mother.  And then if you have an

5   agreement, send me something and I'll so order it.

6                MR. YANNELLA:  I'll do that.

7                THE COURT:  All right.

8                The rest don't have to stick around for

9   Mr. Yannella's issue, except for his client, Mr. Lembhard.

10               Anything else we should do now?

11               MR. PALMA:  We need a date.

12               THE COURT:  Oh, the date.  I keep forgetting the

13   date.

14               May 8th at 10 a.m.

15               MR. PALMA:  That's not 90 days, your Honor.

16               THE COURT:  It's three months and a week.

17               MS. NICHOLS:  It's 97 days.

18               MR. PALMA:  Wait, wait.  September.  I mean February,

19   March -- oh, okay.  Sorry.

20               Your Honor, can we have 11?

21               THE COURT:  Well --

22               MR. PALMA:  The problem is I come from a distance,

23   far from White Plains.

24               THE COURT:  Fine.  11:00.

25               MR. PALMA:  Thank you.

1            THE COURT:  May 8th, 11:00.

2            I'm going to exclude the time between now and then

3   under the Speedy Trial Act in the interest of justice.  I find

4   the ends of justice served by the exclusion outweigh the best

5   interests of the public and the defendants in a speedy trial

6   because it will enable defendants to receive the remaining

7   discovery --this is not chitchat time, everybody -- it will

8   enable the defendants to receive the remaining discovery for

9   they and their lawyers to review it and to determine what

10  motions make sense.

11            All right.

12            Ms. Newman, hold your thought.

13            Everybody can leave except for Mr. Lembhard.

14            (Pause)

15            THE COURT:  Ms. Newman.

16            MS. NEWMAN:  Thank you, your Honor.

17            I have a very small issue.  It's having to do with

18  amendment of Mr. Seth Blain's bail conditions, which is

19  consented to by Probation and the government, and that is he

20  was previously on home detention, electronic monitoring.

21  Probation has assured me that he's compliant.  They wrote an

22  e-mail with respect to that that I shared with the government.

23  And they now would agree that he should continue on electronic

24  monitoring, but curfew as determined by Probation.  So it's

25  changed by just taking off the home detention aspect of the

201821davic

```
 1    bail and that's it.

 2             THE COURT:  Any objection?

 3             MS. NICHOLS:  No, your Honor.  The government would

 4    defer to Pretrial on this issue.

 5             THE COURT:  I will do the same.  I'll remove the home

 6    detention condition and substitute a curfew at the discretion

 7    of Pretrial.

 8             Keep up the good work, Mr. Blain.

 9             MS. NEWMAN:  Thank you very much, your Honor.  I

10    appreciate it.

11             DEFENDANT SETH BLAIN:  Thank you.

12

13                              - - - -

14

15

16

17

18

19

20

21

22

23

24

25
```