```
 1 │ UNITED STATES DISTRICT COURT
   │ SOUTHERN DISTRICT OF NEW YORK
 2 │
   │ -------------------------------------x
 3 │ UNITED STATES OF AMERICA,
   │
 4 │
   │                         Case No. 17-cr-364
 5 │    -vs-
   │
 6 │ SKYLAR DAVIS, et al.
   │
 7 │                         Defendants.
   │
 8 │ -------------------------------------x
   │
 9 │                              United States Courthouse
   │                              White Plains, New York
10 │                              February 8, 2019
   │                              10:36 a.m.
11 │
   │
12 │ Before:
   │          HONORABLE CATHY SEIBEL
13 │
   │                              District Judge
14 │
   │
15 │
   │ APPEARANCES
16 │
   │ GEOFFREY S. BERMAN
17 │      United States Attorney for the
   │      Southern District of New York
18 │ ALLISON NICHOLS
   │ MAURENE COMEY
19 │ SAMUEL RAYMOND
   │ Assistant United States Attorneys
20 │
   │
21 │
   │ LAW OFFICES OF JOSHUA L. DRATEL, P.C.
22 │ JOSHUA L. DRATEL
   │ and
23 │ MIEDEL & MYSLIWIEC, LLP
   │ FLORIAN MIEDEL
24 │ Attorneys for the Defendant, Davonte Hawkins
   │
25 │
```

```
 1  A P P E A R A N C E S:  (CONT.)

 2  MICHAEL K. BACHRACH
    and
 3  PARKER & CARMODY, LLP
    DANIEL S. PARKER
 4  Attorneys for the Defendant, Troy Young

 5
    LAW OFFICES OF JILL R. SHELLOW
 6  JILL R. SHELLOW
    Attorney for the Defendant, Skylar Davis
 7

 8  ALSO PRESENT:

 9  FBI Special Agent Andrei Petrov

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE DEPUTY CLERK:  The Honorable Cathy Seibel

 2  presiding, United States versus Davis.

 3              THE COURT:  Good morning.  Everyone can have a seat.

 4  Let me first make sure I know who is where.

 5              Good morning, Ms. Nichols, Ms. Comey, Mr. Raymond,

 6  Agent Petrov.

 7              MS. NICHOLS:  Good morning, Your Honor.

 8              MS. COMEY:  Good morning, Your Honor.

 9              MR. RAYMOND:  Good morning, Your Honor.

10              THE COURT:  And Ms. Shellow and Mr. Davis, good

11  morning.

12              MS. SHELLOW:  Good morning, Your Honor.

13              THE DEFENDANT:  Good morning.

14              THE COURT:  And then Mr. Miedel and Mr. Dratel and

15  Mr. Hawkins.

16              MR. MIEDEL:  Good morning, Your Honor.

17              THE COURT:  Good morning.  And then Mr. -- I ask this

18  every time -- Fennell?

19              THE DEFENDANT:  Yes.

20              THE COURT:  Fennell and Mr. Tulman, good morning.

21              That leaves Mr. Young, Mr. Bachrach and Mr. Parker.

22              MR. BACHRACH:  Good morning, Your Honor.

23              THE COURT:  Good morning to all of you.

24              The first thing I want to talk about is the schedule.

25  I have a letter from Ms. Shellow from January 25th asking for an
```

1  adjournment for reasons she set forth in a separate sealed

2  letter, which I will summarize as saying an obligation to

3  another client.  I endorse that saying I didn't think it was an

4  unavoidable conflict, but I had an open mind, and I asked

5  Ms. Shellow to let me know when there was another window where

6  we could try the case.

7           I guess before I go further, I should ask the

8  government:  Do we still think this is three-plus weeks?

9           MS. NICHOLS:  Yes.  Three to four, Your Honor.

10          THE COURT:  Okay.  I then heard from Ms. Shellow,

11  essentially, that if the case didn't go as scheduled, it could

12  go in August or November.  I can't do it in August.

13          I then asked my deputy to inquire whether anybody else

14  was asking for an adjournment.  Ms. Shellow responded -- and

15  this was all by email, and this has all been shared with all

16  parties -- I will summarize the state of play, and if this is

17  not accurate, anybody can speak up and correct me.

18          Ms. Shellow wants an adjournment.  Mr. Miedel can do

19  it as scheduled, but has a family reason why he would like it if

20  the date were adjourned.  Mr. Dratel is going to be with me on

21  one case or another, and the other lawyers are not asking for

22  adjournment, not opposing it either.

23          Is that a fair summary?

24          MS. SHELLOW:  Your Honor, I believe that is a fair

25  summary.

```
 1              MR. TULMAN:  Yes, Your Honor.  On behalf of myself and
 2  my co-counsel on the matter, Mr. Sosinsky, who is literally next
 3  door with Judge Briccetti when this was moved to 10:30, so he is
 4  not here, the November date would be the date that would work
 5  for us.
 6              THE COURT:  You can either do it as scheduled or
 7  November?
 8              MR. TULMAN:  As scheduled or November.
 9              THE COURT:  All right.  And the government has advised
10  my deputy that they don't think the reasons for seeking the
11  adjournment are valid, but I gather since I have another trial
12  date that's up in the air because this trial date is up in the
13  air, their office is taking the position, with a capital "O",
14  that ideally, they would like that other case to go first with
15  this case not slipping very much.
16              Is that fair to say?
17              MS. NICHOLS:  Yes, Your Honor.
18              THE COURT:  I guess the other question I have is
19  whether everybody in this room plans to stay on the case through
20  the trial.  Ms. Shellow said that Mr. Rico may be asking to be
21  relieved.
22              MS. SHELLOW:  Mr. Rico may be asking to be relieved.
23  Once the scheduling issues came up, he did not file a motion to
24  withdraw so that he could be available to accommodate Your
25  Honor's schedule if there was -- if his presence is helpful.
```

```
 1              THE COURT:  Well, Mr. Rico is always helpful; just a
 2   good guy to have around.  All right.  But everybody who is here
 3   is planning on staying in?  I've got to say, I don't see how the
 4   reasons that have been advanced just by postponing the trial.
 5   Ms. Shellow has another client who will need some attention in
 6   May and June, but it doesn't seem like an unavoidable conflict.
 7   Certainly not -- she's not going to have to be with him on a
 8   daily basis, and that other matter is starting two weeks before
 9   this one; and I understand how busy the run-up to trial is, but
10   it gets really crazy once you get the 3500, and that's in the
11   time where that other matter will already be off the ground.
12              And I have got -- I have got detained defendants here.
13   It's a murder case.  I don't see how I can say it's in their
14   interests to put the trial off for four months when you have
15   four months when -- well, that's the reason.  I also don't see
16   how I could say it was in the best interests of the public to do
17   that.
18              So I think we leave this trial date where it is, and I
19   know that's going to make the government unhappy in another
20   case, but so be it.
21              If that means that it makes sense for Mr. Rico to stay
22   in the case representing Mr. Davis, he should do that.  If there
23   is a reason why he can't or he shouldn't, but Ms. Shellow, you
24   want other co-counsel appointed, then we still have five months
25   to trial, so I think the -- and Mr. Miedel already has
```

1   co-counsel.  So I think any time crunch come June can be

2   alleviated in large part with co-counsel.  So we are going to

3   just leave this where it is.

4          MS. SHELLOW:  Your Honor, I will just draw to your

5   attention, Mr. Rico is starting a trial in the Eastern District

6   before Judge Matsumoto on the 24th of June.  So his

7   availability, I think, will be limited for a trial that starts

8   on July 8th.

9          THE COURT:  Well, I don't know who set the trial date

10  first, but this trial date has been set for a long time.  If he

11  tied himself up, I can't really help him with that.

12          What I would say is, first of all, you never know

13  what's going to happen.  Maybe his client in the Eastern

14  District isn't going to go.  Maybe that trial will slip, but if

15  the time that you will have to devote to your other client is

16  going to be significant, and you need co-counsel in this case,

17  and it can't be Mr. Rico, we should get somebody else --

18          MS. SHELLOW:  Right.

19          THE COURT:  -- now because -- while there is still

20  five months to prepare.  I don't want to hear, you know, in

21  April, oh, my God, I need another lawyer appointed.

22          MS. SHELLOW:  Thank you, Your Honor.

23          THE COURT:  All right.  I have a slew of motions to

24  rule on.  Mr. Hines' motion is now moot because he has resolved

25  his case.

1          Although I do think the government needs to educate

2    the agents involved in that suppression motion that when the

3    defendant says he doesn't want to talk without a lawyer, it's

4    not cool to then say, "Well, in that case, I am not giving your

5    cousin's phone back."  That looks like the agent is trying to

6    coerce the witness -- the defendant.  So I am not sure that -- I

7    don't think that was defensible, that particular action, and the

8    agents ought to be aware of that.

9          Let me turn to now the motions to suppress Facebook

10   evidence.  Mr. Fennell made a motion, and Mr. Young made a

11   motion.  I have read the papers.  Anything anybody wants to say

12   on those particular motions that's not covered by the papers?

13          MR. TULMAN:  I will rely on the record, Your Honor.

14          MR. BACHRACH:  I can rely on the record with one thing

15   I just thought would be helpful, and may or may not be helpful.

16          I noticed in the government's brief there was a remark

17   that we didn't understand why the one particular Facebook entry

18   that it was referring to was a private or a "friends only"

19   message versus a public message or -- and I -- there is an easy

20   answer to that to explain that -- that difference, why I am only

21   really focusing on the private instead of public.

22          If you look at Exhibit H, which is the Facebook entry?

23          THE COURT:  Hold on.  Okay.  I am with you.

24          MR. BACHRACH:  If you see the date, April 26th, which

25   is the date of the Facebook post, just to the right of it is an

PROCEEDINGS

1  icon for two people.  That indicates through Facebook that it's

2  a message between -- from the inmate -- excuse me -- from the

3  individual to his Friend list.  There is no way of telling from

4  this whether it's just friends or friends of friends as well.

5  That would require additional information that's not part of the

6  record; but if that indicates that it's only to Facebook

7  friends; if this was a public post instead of having two -- an

8  icon of two individuals, you have an icon of a globe.

9         So that is why this one, as opposed to the other

10  Facebook posts, are the ones that we have focused in on, and we

11  did not move to suppress any of the posts where there was a

12  globe because we knew that those are then public.  That was the

13  only thing I thought might be worth correcting on the record.

14         THE COURT:  All right.  Thank you.  Let's start with

15  Mr. Fennell's motion.  He argues that the fruits of the search

16  of his Facebook account should be suppressed because the search

17  warrant for that content was overbroad in that it had no time

18  limitation, and that even though the affidavit in support of the

19  search warrant only showed probable cause for criminal activity

20  and Facebook use in furtherance of that activity beginning in

21  2016, Facebook apparently provided information going back to

22  2011.

23         Overbreadth deals with the requirement that the scope

24  of the warrant be limited to the probable cause on which the

25  warrant is based.  Thus, a warrant can violate the Fourth

1  Amendment if it seeks specific material as to which no probable

2  cause exists.  *U.S. against Cioffi*, 668 F. Supp. 2d 385 at 390,

3  Eastern District 2009.  So, quote, "An otherwise unobjectionable

4  description of the objects to be seized is defective if it is

5  broader than can be justified by the probable cause on which the

6  warrant is based."  Unquote.  *U.S. against Galpin*, 720 F.3d 436

7  at 446, and I've left out internal quotation marks and

8  citations.

9         Warrants that do not link the evidence sought to the

10  criminal activity supported by the probable cause do not satisfy

11  the particularity requirement because they lack meaningful

12  parameters on an otherwise limitless search of a defendant's

13  electronic media.  *U.S. against Ulbricht*, 858 F.3d 71 and 99 to

14  100.  Cert. denied.  138 Supreme Court 2708.  There is no clear

15  rule from the Second Circuit on what time limits are required in

16  search warrants.

17         And now I am going to have a long quote from a case

18  called Cohan, *U.S. v. Cohan*, 628 F. Supp. 2d 355 at 365 to 67,

19  Eastern District 2009.  That case said as follows:  "In a number

20  of out-of-circuit decisions, courts have found warrants for the

21  seizure of business records constitutionally deficient where

22  they imposed too wide a timeframe or failed to include one all

23  together.  Still, other out-of-circuit decisions have not

24  treated a warrant's lack of a timeframe as dispositive.  Amongst

25  the district courts in this circuit, while there is general

1   agreement that a timeframe is relevant, there is no apparent

2   consensus as to when one is required." See, for example, *U.S.*

3   *v. Costin*, 2006 Westlaw 2522377 at page 11, where the Court

4   said, "A warrant's failure to include a time limitation where

5   such limiting information is available and the warrant is

6   otherwise wide-ranging, may render it insufficiently

7   particular." Unquote. *Triumph Capital*, 211 F.R.D. at 58, which

8   said, "A temporal limitation in a warrant is not an absolute

9   necessity, but is only one indicium of particularity." *U.S.*

10  *against Gotti*, 42 F. Supp. 2d, 252 at 274, S.D.N.Y. 1999, where

11  the Court says, "Nor, in light of the circumstances and the fact

12  that the brokerage company at issue there was believed to have

13  served only as an instrumentality of racketeering, is the

14  warrant defective because it contained no time limitations."

15  Blumberg 1998 Westlaw 136174 at 7; stating that the presence of

16  a timeframe in a warrant is a factor the Court should consider

17  in its analysis. *U.S. versus Hickey*, 16 F. Supp. 2d, 223 at

18  239, E.D.N.Y. 1998, where the court says, "Clearly the warrants

19  being devoid of a time limitation authorized searches for

20  documents that both predate and postdate the periods of charged

21  criminality. This void supports defendants' overbreadth

22  argument." *Roberts versus United States*, 567 Eastern District

23  2009656 F. Supp. 929, 935, S.D.N.Y. 1987, where the Court says,

24  "With no limit as to the dates of the documents to be seized,

25  the warrant authorized a generally exploratory rummaging in the

 1  person's belongings."  That was reversed on other grounds in the

 2  852 F.2d 671; and *Zanche*, 541 F. Supp. at 210, where the Court

 3  said, "While I do not agree that a limited timeframe will never

 4  be called for...courts in this circuit have approved warrants

 5  for business records unrestricted by time limitations."

 6  Unquote.  That's all from *Cohan*.  See also *U.S. v. Jacobson*, 4

 7  F. Supp. 3d 515 at 526, E.D.N.Y. 2014, where the warrant's

 8  failure to include the temporal limitation in that Court's view

 9  might, in certain circumstances, render the warrant

10  insufficiently particular, but the court noted there was no

11  consensus in the circuit as to when such a limitation is

12  required.

13       And *U.S. v. Hernandez*, 2010 Westlaw 26544 at page 11,

14  S.D.N.Y., January 6, 2010, where the Court said, "The complexity

15  and duration of the alleged criminal activities render a

16  timeframe less significant than in a case that required a search

17  for a small set of discrete items related to one or only a few

18  dates."

19       Here, the events don't relate to one or only a few

20  dates, but on the other hand, the case was not particularly

21  complex, and it would not have been difficult to provide a

22  timeframe.  Courts outside the circuit have held that, quote,

23  "Failure to limit broad descriptive terms by relevant dates when

24  such dates are available to the police will render a warrant

25  overbroad."  *U.S. against Abboud*, 438 F.3d 554 at 576, Sixth

1  Circuit 2006.

2          That court also said that a finding of overbreadth

3  requires severance of the inferred portion of the warrant from

4  the remainder which passes constitutional muster and suppression

5  of the evidence relating to the period for which the affidavit

6  did not contain probable cause.  Again, *Abboud* at 576.

7          It may well be that the search warrant here was

8  overbroad, but I need not reach a definitive conclusion on that

9  subject because suppression is not required if a good faith

10  exception applies.  *U.S. against Leon*, 468 U.S. 897, the Supreme

11  Court held that a violation of the Fourth Amendment does not

12  justify exclusion of the resulting evidence when an officer

13  acting with objective good faith has obtained a search warrant

14  from a judge or magistrate and acted within its scope.  That's

15  *Leon* at 920.  The court reasoned that in the ordinary case an

16  officer cannot be expected to question the magistrate's probable

17  cause determination or his judgment that the form of the warrant

18  is technically sufficient.  That's at 921.

19          Accordingly, it concluded that where an officer's

20  reliance on the magistrate's probable cause determination and on

21  the technical sufficiency of the warrant he issues is

22  objectively reasonable or reviewing court's subsequent

23  determination that the warrant was constitutionally infirm will

24  not trigger the exclusionary rule.  That's *Leon* at 92, see

25  *Massachusetts v. Sheppard*, 468 U.S. 981 at 989 to 90, where the

1   Court said, quote, "We refuse to rule that an officer is

2   required to disbelieve a judge who has just advised him...that

3   the warrant he possesses authorizes him to conduct the search he

4   has requested."

5           The good-faith inquiry is confined to the objectively

6   ascertainable question, whether a reasonably well-trained

7   officer would have known that the search was illegal despite the

8   magistrate's authorization.  *Leon* at 922, note 23.

9           It requires officers to have a reasonable knowledge of

10  what the law prohibits, 919 note 19, and thus will not apply if

11  the warrant is so facially deficient.  In other words, for

12  failing to particularize the place to be searched or the things

13  to be seized, that the executing officers cannot reasonably

14  presume it to be valid.  That's at 923.

15          Other courts have held, and I agree, that, quote, "The

16  absence of a clear rule in the circuit on the subject" -- excuse

17  me, "the absence of a clear rule in this circuit," unquote,

18  regarding whether the failure to include a timeframe renders the

19  warrant invalid, quote, "supports a conclusion that the officers

20  acted in good-faith reliance on the warrant," unquote.  *U.S.*

21  *versus Nguyen*.  2014 Westlaw 1512030 at page 20, Western

22  District, April 7, 2014.  Collecting cases.  Report and

23  recommendation adopted 2014 Westlaw 1795045, Western District,

24  May 6, 2014.

25          As the court in Cohan held, quote, "In light of the

1  conflicting authorities, the court would have to speculate as to

2  how the Second Circuit would decide when, if at all, the lack of

3  a timeframe would render a warrant for seizure of business

4  records overbroad.  However, the Court need not do so because

5  this uncertainty triggers the good-faith exception to the

6  exclusionary rule recognized in *U.S. versus Leon*."

7          Since the Second Circuit has never addressed when, if

8  at all, timeframes are a constitutional requirement in business

9  records search warrants, and district courts in this circuit

10 have not converged upon a clear rule, the court cannot say that

11 any reasonably well-trained officer would have known that the

12 search was illegal despite the magistrate's authorization.

13 That's *Cohan* at 355, see *U.S. against Westley*, 2018 Westlaw

14 3448161 at page 17, District of Connecticut, July 17, 2018,

15 which found the good-faith exception applicable in part because

16 quote, "Courts have yet to delve fully into the complexities of

17 the application of the Fourth Amendment to social media,"

18 unquote, including, quote, "whether and how to require date

19 restrictions on dynamic content of the type found in social

20 media accounts."  Unquote.

21          So I am denying the motion to suppress on the basis of

22 the good-faith exception.

23          Mr. Young has a different motion.  He argues that the

24 contents of his account should be suppressed because the

25 government did not give a search warrant for them, and he did

1  not consent to the government seizing those contents.

2          For a Fourth Amendment violation to exist, the

3  government must violate a reasonable expectation of privacy.  A

4  reasonable expectation of privacy exists where the defendant has

5  a subjective expectation of privacy, and it's one that society

6  recognizes as reasonable.  *Katz versus United States*, 389 U.S.

7  347.

8          "Whether the Fourth Amendment precludes the government

9  from viewing a Facebook user's profile absent a showing of

10  probable cause depends, among other things, on the user's

11  privacy settings."  *U.S. versus Meregildo*, 883 F. Supp. 2d 523

12  at 525, S.D.N.Y. 2012.  Facebook allows an account to be

13  private, to be available only to people who "friend" the account

14  holder or whom the account holder himself "friends;" to be

15  available not only to friends, but to friends of friends or to

16  be public.  *U.S. versus Devers*, 2012 Westlaw 12540235 at page 2,

17  Northern District of Oklahoma, December 28, 2012.  See Westley

18  at page 6.

19          In the context of electronic publication of

20  information on Facebook, defendants have the burden of

21  establishing -- defendants have the burden of establishing

22  standing, or in other words, a subjective expectation of privacy

23  in their Facebook pages that society is prepared to recognize as

24  reasonable.  *Devers* at page 2.  Here, "Defendants have not

25  provided affidavits or any other facts concerning the privacy

1  settings on their Facebook accounts or any steps they took to

2  keep their Facebook content private." *Westley* at 6.  Because

3  defendants have not submitted any information regarding steps

4  they took to keep their Facebook content private, they have not

5  met their burden to demonstrate that they had a reasonable

6  expectation of privacy in the information searched, and the

7  motion fails on this ground alone.  Westley at 7.

8            In any event, the government represents that the

9  Facebook evidence of Young that it obtained it got either from

10 public posts or via an undercover account where the undercover

11 was a friend of Young.  Meaning, either that Young "friended"

12 the undercover, in that Young sent a request to the undercover

13 to be Facebook friends and the undercover accepted, or more

14 likely, the undercover "friended" Young, and Young accepted.

15           There is no expectation of privacy in an open Facebook

16 page.  *U.S. versus Adkinson*, 2017 Westlaw 1318420 at 5, Southern

17 District of Indiana, April 7, 2017.  And where defendant has

18 shared his Facebook posts with friends, he does not have

19 expectation of privacy that society recognizes as reasonable.

20 As Judge Pauley held in *Meregildo*, 883 F. Supp. 2d 526, quote,

21 "where Facebook privacy settings allow viewership of postings by

22 friends, the government may access them through a cooperating

23 witness who is a friend without violating the Fourth Amendment."

24 Unquote.  The same is true of a "friend," in quotation marks,

25 who is an undercover.

1           Judge Pauley goes on in Meregildo as follows:  Quote,

2    "While defendant undoubtedly believed that his Facebook profile

3    would not be shared with law enforcement, he had no justifiable

4    expectation that his friends would keep his profile private, and

5    the wider his circle of friends, the more likely his posts would

6    be viewed by someone he never expected to see them.  The

7    defendant's legitimate expectation of privacy ended when he

8    disseminated posts to his friends because those friends were

9    free to use the information however they wanted, including

10   sharing it with the government.  When the defendant posted to

11   his Facebook profile and then shared these posts with his

12   friends, he did so at his peril."  Unquote.

13          In short, the Fourth Amendment does not guard against

14   the risk that the person from whom one accepts a friend request

15   and to whom one voluntarily discloses information might turn out

16   to be an undercover officer or a false friend.  *Everett versus*

17   *State*, 186 A.3d, 1226 at 1236, Delaware 2018.  See *Devers* at 2,

18   where the court said, "unless the defendant can prove that the

19   Facebook account contained security settings which prevented

20   anyone from accessing the account, the legitimate expectation of

21   privacy ended when they disseminated posts to their friends

22   because those friends were free to use the information however

23   they wanted, including sharing it with the government."  *U.S.*

24   *versus Soderholm*, 2011 Westlaw 5444053 at page 7, District of

25   Nebraska, November 9, 2011, where the court says that the

1  defendant's files were restricted to friends did not alter the

2  fact that they were no longer private and that the defendant

3  bore the risk that material he shared with friends would find

4  its way to law enforcement, and even if the defendant had a

5  Fourth Amendment interest by designating an undercover as the

6  friend, the defendant voluntarily consented to the undercover

7  viewing and downloading the material.  And *U.S. versus Gatson*,

8  2014 Westlaw 7182275 at page 22, District of New Jersey,

9  December 16, 2014, which found no Fourth Amendment violation

10  where law enforcement officers used an undercover account to

11  become Instagram friends, and the defendant accepted, and

12  that -- and the courts concluded no search warrant was required

13  for the consensual sharing of the information the defendant

14  posted, and that was affirmed at 744 Fed. Appendix 97.

15          So the motion to suppress Mr. Young's Facebook

16  evidence is also denied because he has not shown a subjective

17  expectation of privacy in the material at issue; and even if he

18  had, it is not one society recognized as reasonable because he

19  shared the information with others; and even if he had an

20  expectation of privacy, he consented to sharing information with

21  the undercover.  If the facts at trial develop differently than

22  represented or if the government can't lay a proper foundation,

23  the defendant may have grounds to renew if he can make a

24  threshold showing that he has not made here.

25          Next is Mr. Young's motion to suppress three sets of

1  statements:  Two made while he was in the hospital and one made

2  post arrest.  Anybody want to add anything on that?

3           MR. BACHRACH:  Defense rests -- relies on its papers,

4  Your Honor.

5           MS. NICHOLS:  Nothing further from the government,

6  Your Honor.

7           THE COURT:  All right.  Let's see, the first issue is

8  whether the defendant was in custody when he made the

9  statements.  There is no dispute that he was in custody when he

10 made the third set of statements, which was after he was

11 arrested, but the parties dispute whether Mr. Young was in

12 custody when he made the -- when he was first interviewed at

13 Westchester Medical Center on February 28th of 2017 and the

14 second time he was interviewed when he was at Helen Hayes on

15 March 6th, 2017.

16          Miranda warnings are not required when the defendant

17 is not in custody.  *Beckwith versus United States*, 425 U.S. 341

18 at 346 to 47.  The test for determining custody is an objective

19 inquiry that asks whether a reasonable person would have thought

20 he was free to leave or end the police encounter at issue, and

21 whether a reasonable person would have understood his freedom of

22 action to have been curtailed to a degree associated with formal

23 arrest.  *U.S. versus Faux*, 828 F.3d 130 at 135.  The Faux court

24 went on to explain that although both elements are required, the

25 second is the "ultimate inquiry" because the "free-to-leave

1  inquiry" reveals only whether the person has been seized.  Not

2  all seizures amount to custody.  A seizure is a necessary, but

3  not sufficient, condition.  Further, an individual's subjective

4  belief about his or her status generally does not bear on the

5  custody analysis.  Thus, in determining whether a defendant was

6  in custody, the court must first determine whether in light of

7  the objective circumstances of the interrogation, a reasonable

8  person would have felt that he was at liberty to terminate the

9  interrogation.  If the answer is yes, the inquiry concludes.

10 If, on the other hand, a reasonable person would not have felt

11 free to do that, the court must proceed to the second step and

12 determine whether a reasonable person would have understood his

13 freedom of action to have been curtailed to a degree associated

14 with formal arrest.  Only if the answer to the second question

15 is yes, was the person in custody for practical purposes and

16 entitled to the full panoply of protections prescribed by

17 Miranda.  *U.S. versus Parker*, 116 F. Supp. 3d, 159 at 169 to 70,

18 Western District 2015.

19        When the individual's freedom of movement is otherwise

20 limited, the free-to-leave analysis is inapplicable, and the

21 appropriate inquiry is whether a reasonable person would feel

22 free to decline the officer's requests or otherwise terminate

23 the encounter.  *Florida v. Bostick*, 501 U.S. 429 at 436.

24        An individual who understands that his detention is

25 not likely to be temporary and brief, and feels that he is

1  completely at the mercy of the police, could reasonably deem his

2  situation comparable to formal arrest.  Relevant considerations

3  include:  One, the interrogation's duration; two, its location,

4  for example, at the suspect's home, in public, in a police

5  station or at the border; three, whether the suspect volunteered

6  for the interview; four, whether the officers used restraints;

7  five, whether weapons were present and especially whether they

8  were drawn; and six, whether officers told the suspect he was

9  free to leave or under suspicion.  *Bostick* at 436, see *U.S.*

10  *versus Fnu Lnu*, 653 F.3d 144 at 153, which noted that the

11  circumstances also include the nature of the questions asked.

12          Several circuits have concluded that Miranda custody

13  is not established merely because an interview occurs in a

14  hospital and the defendant is receiving medical treatment.  *U.S.*

15  *versus Parker*, 116 F. Supp. 3d at 171.  Collecting cases.  The

16  analysis requires, quote, "Careful differentiation between

17  police-imposed restraint and circumstantial restraint."

18  Unquote.  *U.S. versus Jamison*, 509 F.3d 623 at 629, Fourth

19  Circuit 2007.  That court explained that in dissecting the

20  perceptions of a reasonable person, the court must be careful to

21  separate the restrictions on his freedom arising from the police

22  interrogation and those incident to his background

23  circumstances.  That is, to the extent that the defendant feels

24  constrained by his injuries, the medical exigencies they have

25  created, such as the donning of a hospital gown and the

1  insertion of an intravenous line, or the routine police

2  investigation they initiated, such limitations on the

3  defendant's freedom should not factor into the reasonable person

4  analysis. *Jamison* at 629. See *U.S. against Casellas*, 149 F.

5  Supp. 3d, 222 at 240 to 41, District of New Hampshire 2016.  In

6  that case the defendant was in the hospital after a gunshot

7  wound, but he was not in custody where the staff came and went.

8  Also there were only two officers.  They did not restrain -- the

9  defendant was a she, actually -- they did not restrain the

10  defendant, even though she was confined to bed, and the

11  interview was lengthy but relaxed and cordial.

12         Here both hospital interviews are on video.  The video

13  is clear with respect to both that nothing occurred that would

14  have led a reasonable person to believe he could not end the

15  encounter.  Defendant was confined because of his injuries, not

16  because of anything the police did.

17         The police never indicated that the defendant had to

18  talk.  Hospital personnel had access to the room, and I note

19  that the cops did not, as the defendant suggests, shoo anyone

20  away.  The video shows that a nurse who came in asked who the

21  officers were, and when she found out, she left of her own

22  volition.  Further, the defendant had his phone with him.  The

23  officer's tone was calm and not commanding.  No guns were

24  displayed.  No restraints were used.  Only two officers were

25  present.  The police asked the defendant for his help, and in

1  both instances, they gave up in less than an hour when it became

2  clear he was not giving help.  They were there about 45 minutes

3  the first time and about 30 minutes the second time.

4         That conclusion ends the inquiry; the conclusion that

5  a reasonable person would not have believed he could not end the

6  encounter.  And even if the defendant could have thought he was

7  not free to end the encounter, he could not have thought he was

8  subject to restraints comparable to a formal arrest essentially

9  for the same reasons.  So no Miranda warnings were required for

10  the hospital interviews, although they were for the postarrest

11  interview.

12         In any event, Miranda warnings were given all three

13  times.  The defendant says with respect to the hospital

14  interviews, that the warnings did not suffice because his waiver

15  was not knowing in that he was in such a condition that he could

16  not understand them.  His affidavit does not say that he did not

17  understand or that his medications affected his ability to do

18  so.  He has provided medical records showing that he was on a

19  lot of different medications, but that does not show that he did

20  not understand what was going on, and the videos revealed that

21  he did.  Defendant's responses to the police show that he was

22  oriented, alert and coherent.  His reactions to their questions

23  and answers were appropriate and relevant.  I don't doubt that

24  he was on a lot of medicine, but it was not sufficient to render

25  him incapable of understanding what was going on.  It's plain

1    that he did.   See *Casellas*, 149 F. Supp. 3d at 244, where the

2    defendant argued that her mental state was compromised because

3    she was a shooting victim on pain medication and experiencing

4    withdrawal symptoms, but there was no evidence that those facts

5    compromised her mental state.   Also see *U.S. against Cristobal*,

6    293 F.3d 134 at 138 to 143, a Fourth Circuit case from 2002

7    where the suspect was interviewed the day after he suffered

8    multiple gunshot wounds and while he was taking painkillers and

9    narcotics, and he was nevertheless capable of making a knowing

10   and intelligent waiver of his Miranda rights.

11          Here, each time Mr. Young was interviewed in the

12   hospital, he indicated right-by-right that he understood his

13   rights and wished to talk.   Even the second time when he

14   declined to sign a waiver form because he said his mother had

15   advised him not to sign anything, he affirmatively indicated

16   verbally that he understood and wished to talk.   So there is no

17   defect in the administration of the Miranda warnings or the

18   defendant's understanding thereof.

19          Apart from Miranda, due process requires that

20   statements be voluntary.   Defendant argues that his waiver was

21   not voluntary because the police led him to believe he was

22   merely a victim when, in fact, he was a suspect because he

23   believed that if he didn't sign the waiver form, his statements

24   could not be used against him.   That latter argument, even if

25   true, is irrelevant.   It is well settled that a defendant can

1   waive his Miranda rights notwithstanding his refusal to sign a

2   written Miranda waiver form.  *U.S. versus Downs*, 2014 Westlaw

3   3736056 at page 3, District of Vermont, July 29, 2014.  And that

4   was affirmed, although I don't have the cite, and that case

5   cited *Berghuis versus Thompkins*, 560 U.S. 370, and *Plugh*, 648

6   F.3d 118.

7          The focus is not on the defendant's subjective belief,

8   but what a reasonable person in his position would believe.

9   Defendant points to nothing that would have led a reasonable

10  person to believe that refusing to sign, but verbally agreeing

11  to talk, after being advised that what he said could be used

12  against him, meant that his statements were somehow protected.

13  Coercive police activity is necessary to make a statement

14  involuntary, but defendant's unilateral misunderstanding will

15  not suffice.  *U.S. versus Williams*, 2004 Westlaw 1637026 at

16  page 2, S.D.N.Y., July 20, 2004.  Suppression is a prophylactic

17  remedy designed to prevent and deter police misconduct.  It

18  would make no sense to apply it where the police do not do

19  anything wrong, but the defendant, for idiosyncratic reasons of

20  his own, made an incorrect legal assumption.  A defendant's

21  quote, "misunderstanding about the purposes for which his

22  statements could be used did not stem from misrepresentation by

23  the... investigators and therefore does not on its own

24  constitute a showing of police coercion sufficient to warrant

25  suppression of his statements." Unquote.  *U.S. versus Male*

1  *Juvenile*, 280 F.3d 1008 at 1022 to 23, Ninth Circuit 2002.  See

2  *U.S. versus Bowles*, 2005 Westlaw 2271920 at page 3, District of

3  Maine, September 15, 2005 where the court said unilateral mis-

4  understanding would not suffice to render a Miranda waiver

5  involuntary.  The focus is on curbing abusive police practices.

6  Report and recommendation adopted.  2005 Westlaw 3115865

7  November 21st, 2005.

8          That leaves defendant's argument that he was tricked

9  or misled regarding his status.  "The test of voluntariness of a

10 confession is whether an examination of all the circumstances

11 discloses that the law enforcement" -- excuse me -- "that the

12 conduct of law enforcement officials was such as to overbear the

13 defendant's will to resist and bring about confessions not

14 freely self-determined."  *U.S. versus Okwumabua*, 828 F.2d 950 at

15 952 to 53.  "Simple failure to inform defendant that he was the

16 subject of an information does not amount to affirmative deceit

17 unless the defendant inquired about the nature of the

18 investigation and the agents' failure to respond was intended to

19 mislead."  *U.S. versus Serlin*, 707 F.2d 953 at 956, Seventh

20 Circuit 1983.  A valid waiver of the Fifth Amendment right does

21 not require that an individual be informed of all information

22 useful in making his decision or all information that might

23 affect his decision whether to speak.  The Supreme Court has

24 never read the Constitution to require that the police supply a

25 suspect with a flow of information to help him calibrate his

1  self-interest in deciding whether to speak or stand by his

2  rights.  *Colorado v. Spring*, 479 U.S. 564 at 576 to 77.

3  However, sins of commission are different from sins of omission.

4          Quote, "Affirmative misrepresentations by the police

5  may be sufficiently coercive to invalidate a suspect's waiver of

6  the Fifth Amendment privilege."  Unquote.  *U.S. versus Anderson*,

7  929 F.2d 96 at 100.  To prevail on a claim of trickery and

8  deception, a defendant must produce clear and convincing

9  evidence that the agents' affirmatively misled him as to the

10  true nature of their investigation.  It must also be shown that

11  the misrepresentations materially induced the defendant to make

12  incriminating statements.  Inculpatory statements are not

13  involuntary when they result from a desire to cooperate, or from

14  a defendant's ignorance of, or inattention to, his right to

15  remain silent.  Further, agents' failure to fully explain the

16  purpose of the interviews does not amount to affirmative deceit

17  unless the defendant inquired about the nature of the

18  investigation and the agents' failure to respond was intended to

19  mislead.  *U.S. versus Mitchell*, 966 F.2d 92 at 100.  Statements

20  are not involuntary because a defendant's ignorance has caused

21  him to fail to assert his privilege against self-incrimination.

22  *U.S. v. Mast*, 735 F.2d 745 at 750.  "The Constitution does not

23  require that a criminal suspect know and understand every

24  possible consequence of a waiver of the Fifth Amendment

25  privilege."  *Colorado v. Spring*, 479 U.S. at 574.

```
 1            With respect to the February 28, 2018 interview,
 2   defendant says the police tricked him into believing he was only
 3   a witness or a victim and not a suspect and that they were
 4   reading the Miranda warnings only to protect him in case he was
 5   the one who threw a bottle and started the melee at the
 6   Valentine's Day party that resulted in Mr. Young being paralyzed
 7   and Mr. Owens Grant being killed, among other things.
 8            The defendant's description of the events over-
 9   simplifies what happened.  The video shows that the officers
10   said that the police were trying to figure out what happened and
11   who had shot Mr. Young; that they didn't know yet; that there
12   was a lot going on, and it was chaotic that night, and that they
13   quote, "Were having a hard time figuring out if you threw a
14   bottle or someone else threw a bottle or he shot or she shot or
15   what have you."  Unquote.  That's about 7 -- at about the
16   7-minute mark on the recording.
17            And they went on to say that they were therefore
18   reading Miranda warnings to everyone just in case it turns out
19   that the defendant threw a bottle and someone got stitches.
20   It's clear that that last part was by way of example because
21   moments before, the officer had raised the possibility, not just
22   of throwing a bottle, but of shooting a gun.  The officers made
23   clear from the outset that it was possible the defendant had
24   criminal exposure.  They went on to say that they wanted to get
25   the investigation right and that it's a serious matter because
```

1   the defendant was a shooting victim, which was obvious.  Saying

2   the defendant was a shooting victim was not any sort of

3   assurance that he was only a victim or would not have any

4   criminal exposure.  To the contrary, the officers had made clear

5   that the defendant might well have such exposure.  I do

6   disapprove of the officers' statement that the Miranda warnings

7   were, quote, "legal mumbo-jumbo" as well as his rushed reading

8   of the rights, but that inappropriate conduct, which could be

9   regarded as devaluing important constitutional rights and about

10  which the government ought to educate the officer, does not

11  detract from the fact that the defendant heard each right, said

12  he understood each right, signed a waiver, and could not have

13  been under the impression that the police did not suspect any

14  criminal behavior on his part.

15          Assuming that the agents, in fact, suspected the

16  defendant of doing worse than throwing a bottle, any failure to

17  fully explain the purpose of the interviews does not amount to

18  affirmative deceit unless the defendant asks and the agents

19  intentionally mislead.  *Mitchell* at 100.  No such inquiry was

20  made here.  Further, within five minutes of the warnings, which

21  were in 8:27 on the tape, the officer at 13:00 or 13 minutes of

22  the tape, made clear that he knew Mr. Young was lying to him.

23  He said -- and again, I don't approve of this language -- quote,

24  "I'm not an idiot.  Don't play me for a retard."  Unquote.

25          And he reiterated his scepticism three minutes later

1  at 16 minutes where he said to Mr. Young, "I know from the video

2  that you were shot at 3:00 in the morning, so I don't know why

3  you keep saying you left the party at 8:30 or 9:00."

4         At 19:50, the officer tells the defendant that the

5  only thing worse than being in the physical condition the

6  defendant was in was being in that condition in prison.

7         At 27:15, the officer says he's confident that he can

8  prove the defendant had a gun and pulled the trigger.  At

9  35 minutes, the officer says, the defendant's not going to be

10 able to start to remember when the officer arrests him, and at

11 39 minutes the officer tells the defendant he does not want to

12 be putting cuffs on the defendant the next time he sees him.

13        Defendant, in other words, was told again and again

14 that he is a suspect, but each time he continued to talk,

15 belying his claim that he would not have spoken had he known he

16 was a subject or a target.

17        The defendant's, quote, "Apparent understanding of his

18 precarious situation and disregard of this danger is an

19 additional basis for finding that the withholding of the

20 information did not impact his free choice to testify."

21 Unquote.  *U.S. against Valdez*, 16 F.3d 1324 at 1330.

22        So I find that the defendant has not shown by clear

23 and convincing evidence either that the officers affirmatively

24 misled him on February 28th or that any misrepresentations

25 materially induced him to inculpate himself, even if more

1  information might have been helpful to the defendant in

2  calibrating his self-interest.

3          One of the last things the officers said on

4  February 28th at 42 minutes and five seconds is that the

5  defendant was a shooting victim, but that did not mean he was

6  not also a suspect.  Despite that having been made abundantly

7  clear, the defendant claims with respect to the March 6, 2017,

8  interview that he thought that if he did not sign a form, his

9  statements cannot be used against him, which I have already

10 addressed; and that when he expressed concern that the police

11 viewed him as a suspect, they tricked him by assuring him that

12 he was viewed as a victim.  Again, that does not fairly

13 represent what happened.  It was clear from the previous

14 interview that they viewed him as a suspect, and on this

15 occasion at 2 minutes and 40 seconds, the officer gave Mr. Young

16 each Miranda warning, and each time Mr. Young said he

17 understood, and he said he -- affirmatively that he wanted to

18 talk.

19         The officers made crystal clear right from the start

20 that they think the defendant is lying to them.  They point to,

21 and show him, evidence that contradicts what he has told them.

22 At one point, at 17 minutes and 30 seconds, the defendant says,

23 "You are acting like I am a suspect.  I am the victim."

24 Unquote.  At that point someone comes in to speak to the

25 officer, and he steps out.  When he returns, he says he is just

1  trying to figure the case out.  He says nothing that could

2  reasonably be interpreted as assuring the defendant is not a

3  suspect and was viewed only as a victim.  The entire arc of

4  their conversations going back to the first conversation on

5  February 28th makes any such claim meritless.

6          At 22 minutes and 30 seconds, the defendant again says

7  he is the victim and the police are making it seem like he is a

8  suspect.  The response, which was along the lines of the final

9  remark back from February 28th was, quote, "Somebody shot you,

10 so you are a victim whether you had a gun or not, but you are

11 not being straight with us."  Unquote.  Again, making clear that

12 being a victim and being in trouble are not mutually exclusive.

13 The officer added, "You are still a victim and still being

14 treated that way, but we got to be straight with you.  We are

15 sure you remember more than you are saying."  Unquote.

16          And after each of these exchanges, the defendant again

17 keeps talking.  So, again, it's not just -- it's just not

18 plausible that he would not have spoken had he known that he was

19 not merely a witness or victim.  He was told pointblank on

20 February 28th that being a victim did not mean he is not a

21 suspect.  He repeatedly says he is being treated like a suspect.

22 He gets no assurance to the contrary, and he keeps on talking.

23 So he has not shown by clear and convincing evidence either that

24 the officers affirmatively misled him on March 6th or that any

25 misrepresentations materially induced him to inculpate himself.

1            With respect to his postarrest statements, the

2    defendant concedes he was not tricked or overmedicated, but he

3    says he was, as he was on the earlier occasions, young,

4    uneducated and susceptible to manipulation, so he was unable to

5    understand that refusing to sign was insufficient to invoke his

6    rights or voluntarily make a decision to waive.

7            The government responds that the defendant, after

8    being given his rights, declined to sign a form but did not

9    invoke his rights and spoke, including asking the agents

10   questions; and that his mistaken belief that his statements

11   could not be used against him because he did not sign does not

12   assert any violation of his rights.  That much is true, but the

13   burden is on the government to show a knowing and voluntary

14   waiver.  For example, *U.S. v. Smith*, 2015 Westlaw 7177190 at

15   page 4, E.D.N.Y., November 16, 2015, which said, quote, "To

16   introduce a defendant's custodial statements at trial, the

17   government must show by a preponderance of the evidence that the

18   defendant knowingly, intelligently and voluntarily waived his

19   Miranda rights against self-incrimination.  Thus, the government

20   bears the burden of proving by a preponderance of the evidence

21   both that the defendant was advised of his constitutional rights

22   under Miranda, and that he knowingly, intelligently and

23   voluntarily waived those rights."

24           Because we do not have a recording of this postarrest

25   interaction, nor do we have an affidavit or any other evidence

1  of the circumstances of the statements the defendant made on the

2  date of his arrest, the prudent thing is to have a hearing at

3  which the government can demonstrate that the statements were

4  made after a knowing and voluntary waiver, assuming it's going

5  to introduce those statements at trial.

6          So the motion to suppress the February 28, 2017,

7  statements is denied.  The motion to suppress the March 6, 2017,

8  statements is also denied, and we will have a hearing on the

9  postarrest statements at a date we will set later on.

10         Anybody want to say anything on the motion to dismiss

11 the 924(c) and 924(j) counts?

12         MS. SHELLOW:  No, Your Honor.

13         MR. TULMAN:  No, Your Honor.

14         MR. BACHRACH:  No, Your Honor.

15         THE COURT:  I am assuming the defendants are making

16 this motion mostly to preserve the issue, which is fine.  *U.S.*

17 *v. Barrett*, which is 903 F.3d 166 at 184, precludes the argument

18 that the risk of force clause is void for vagueness.  Here at

19 trial the jury will decide if the facts amount to a crime of

20 violence to the extent it relies on the risk of force clause of

21 924(c), but because the 924(c) and 924(j) charges in the S4

22 Indictment don't link simply to Count One, the RICO conspiracy,

23 but also link to specific drug trafficking crimes or crimes of

24 violence, it's unlikely the jury will be relying on the risk of

25 force clause.  So dismissal would not be appropriate even if a

1  RICO conspiracy with violent crime or drug trafficking

2  predicates is not itself a crime of violence or a drug

3  trafficking crime.  See *U.S. against Russell*, 2018, 3213274 at

4  page 3, Eastern District, June 29, 2018.  In any event, even if

5  the RICO conspiracy count were the only hook of those 924(c) and

6  924(j) counts, *Barrett* at 175 to 77 reiterated that a conspiracy

7  to commit a crime of violence suffices as a predicate under

8  924(c).  *Barrett* involved a robbery conspiracy, but I expect

9  that when presented with a racketeering conspiracy charge with

10 predicate acts of violence, the circuit is going to reach the

11 same conclusion.  See *U.S. against Scott*, a summary order at 681

12 Fed. Appendix 89 and 95, which so found.  Cert. denied.  138

13 Supreme Court 642.  In other words, a conspiracy to commit a

14 crime of violence is a crime of violence under the force clause,

15 so a RICO conspiracy with violent predicates would be a crime of

16 violence, and here the predicates include murder.  See *U.S.*

17 *against White*, 2018 Westlaw 4103490 at page 4, S.D.N.Y., August

18 28, 2018, which found a racketeering conspiracy with violent

19 predicates to be a crime of violence.  See also *U.S. against*

20 *Praddy*, a summary order, at 729 Fed. Appendix 21 and 23, which

21 said a RICO conspiracy is a crime of violence if one of its

22 objects is a crime of violence.

23         If, for whatever reason, *Barrett* is not the law of the

24 circuit at the time of trial, I will revisit all of this, and I

25 also think it might be wise to have special verdicts on the

1   924(c) counts for the jury to specify, if it convicts, what

2   crimes of violence or drug trafficking crimes it found to be the

3   predicates for each count so that we have a clear record for

4   appeal.

5          I think the Bill of Particulars motions are moot.

6   Mr. Fennell got the information he was looking for from the

7   government.  Mr. Young's was I think mooted by the superseder,

8   and Mr. Hines has resolved his case by pleading out.  So unless

9   there is something specific you want me to address, I will move

10  on.  All right.  I will move on.

11         What remains is the 3500 discovery Brady issues.  The

12  first application is for immediate disclosure of all Brady and

13  Giglio.  The standard is well settled.  "The prosecutor must

14  disclose evidence if, without such disclosure, a reasonable

15  probability will exist that the outcome of a trial in which the

16  evidence had been disclosed would have been different.  And it

17  must disclose such material exculpatory and impeachment

18  information no later than the point at which a reasonable

19  probability will exist that the outcome would have been

20  different if an earlier disclosure had been made."  *U.S. versus*

21  *Coppa*, 267 F.3d 132 at 142.  In other words, a Brady obligation

22  exists only if the withholding of evidence would deprive the

23  defendant of a fair trial determined retrospectively by

24  assessing the effect the withheld evidence would have had on the

25  verdict.  Of course, because that is a determination that is

1  made after the fact, a prosecutor concerned about tacking too

2  close to the wind will err on the side of disclosure as the

3  Supreme Court said in *Kyles v. Whitley*, 514 U.S. 419 at 439.

4          Here the defendant, I think this was Mr. Young's

5  motion, is asking for four categories of information:  One is

6  information that anyone other than the defendant was identified

7  as the shooter of Mr. Owens Grant known as "G;" second,

8  information indicating a non-racketeering motive for that

9  shooting; third, information indicating that defendant was not a

10  member of the enterprise.

11          MR. BACHRACH:  Your Honor?  I am sorry to interrupt.

12  Mr. Young, who, as you know, has some severe medical issues,

13  desperately needs to use the restroom.

14          THE COURT:  Oh, that's fine.  Why don't we take a

15  ten-minute break?

16          MR. BACHRACH:  Thank you, Your Honor.

17          (Recess taken.)

18          THE COURT:  Everyone can have a seat.

19          We were talking about the categories of Giglio and

20  Brady that Mr. Young was seeking.  The third one was information

21  indicating he was not a member of the charged enterprise; and

22  the fourth was any Giglio material that's material to the

23  outcome, including prior inconsistent statements, reports

24  reflecting variations of witness statements, indications of

25  bias, substance abuse or mental health issues that affect the

1  ability to perceive and recall.

2           All four categories have to be turned over, and they

3  have to be turned over in time for the defendants to make use of

4  them.  Although Categories 1 through 3, seems to me, could

5  require more significant pretrial investigation than Category 4.

6  The government here has given me an ex parte submission and

7  sought to withhold certain information for safety reasons.

8  There is no exception to Brady for safety reasons, so sooner or

9  later, the government is going to have to take steps to protect

10 witnesses in sufficient time to make its disclosures in

11 sufficient time for the defense to make use of that information.

12          However, a lot of what the defendant seeks I don't

13 think is Brady or Giglio, and I want to take a little time to go

14 through some of it.  The government provided me with a

15 September 21, 2018, letter that it provided the defendants, and

16 using that information, Mr. Bachrach supplemented his

17 application and has theories on why various things need to be

18 turned over.  The government also provided the underlying

19 materials that it didn't give the defendants, but I've looked at

20 them, and here is what I think:  First, as to Witness 1, who is

21 described in the October 21st -- excuse me -- September 21st

22 letter, the defendant says Witness 1's statements are Brady

23 because the witness said that Mr. Owens Grant, who I am just

24 going to call "G" was shot by a tall, dark-skinned guy, but he

25 did not identify the defendant in a photo array, so that must

1  mean that the witness was saying the shooter is not a defendant.
2  It's not at all clear that the witness was even saying that "G"
3  was shot by a tall, dark-skinned guy.  The photo arrays, which
4  the government did provide to the defendants, the way I read
5  them, and going by the times that are written on them, first the
6  witness said he didn't recognize anyone in the array that
7  contained Mr. Young.  He then identified someone named Rayshon
8  Holmes in the second array as a guy he knew as "Shablacky," who
9  got shot in the back, and he then identified "G" in the third
10 array, and what the officer wrote is, quote, "'G' tall,
11 dark-skinned guy shot him."  Unquote.  Which could easily mean
12 that "G" is the tall, dark-skinned guy who shot Shablacky.  If
13 so, it has nothing to do with Mr. Young.  If what the officer
14 wrote meant that a tall, dark-skinned guy shot "G," I don't know
15 how tall Mr. Young is, but he arguably fits that description,
16 and if so, the fact that the witness didn't pick Mr. Young out
17 of an array isn't really Brady.  One could easily be able to
18 give a general description of someone but not have gotten a good
19 enough look to pick someone out of an array, especially in a
20 dark, crowded party during a few chaotic moments.  So I don't
21 see that that account is Brady.  It's certainly not favorable
22 that the defendant fits the witness's description of the
23 shooter, and dark-skinned seems like a fair description of
24 Mr. Young, and he is seated, but he doesn't look particularly
25 short to me.  So I don't think this is really Brady, but in any

1  event, the defense has everything except the witness's name, and

2  can follow up with Shablacky if possible.  But more

3  fundamentally, the failure to pick the defendant out I think is

4  just meaningless here.

5          The second witness, who was identified by name, the

6  co-defendant, Mr. Branch, known as "Bigga," the defendant says

7  that his statements are Brady because he identified someone else

8  as the shooter, and the defense argument is that the summary

9  that the government gave is not as complete as what might be in

10  notes or reports, but the defense certainly has enough there to

11  follow up because they know who to talk to.  So the information

12  is exculpatory, and the defendants know where to go to get it.

13          The defendant argues that Witness 3 statements, the

14  statements of Witness 3 need to be disclosed under Rule

15  16(a)(1)(E) because the redacted notes that were disclosed

16  contain unfavorable information.  I am baffled by this argument.

17  Rule 16(a)(1)(E) relates to the government's obligation to turn

18  over documents and objects.  It does not require the turnover of

19  witness statements before the time designated in Section 3500 or

20  the statements of witnesses that the government does not intend

21  to call, which I am sure counsel well knows, and Rule 16(a)(2)

22  makes abundantly clear.

23          As to Witness 4, the defendant argues that this

24  witness's statements are Rule 16 as to Mr. Fennell and potential

25  Brady as to Mr. Young because the witness identified

1   Mr. Fennell, but not Mr. Young, as the shooter.  For the same

2   reasons, an inculpatory statement is not Rule 16 as to Fennell;

3   and as to Young, not being able to identify someone as a shooter

4   is not equivalent to a statement that someone isn't a shooter,

5   so I don't regard that as Brady there.  There are probably

6   dozens of people who were present who couldn't identify the

7   shooter.

8           The defendant argues that Witness 5's statements are

9   Rule 16 because the government's summary of Witness 5's

10  statement identifies Young and Fennell and others as shooters,

11  but the government didn't turn over the reports and the notes.

12  This witness's statements are not Rule 16 for the reasons I have

13  discussed, and they are inculpatory, so they are not Brady.

14          Defendant argues that Witness 6's statements are Brady

15  under the theory set forth in *Mahaffy*, 693 F.3d 113 at 130,

16  which held that statements that are inculpatory as well as

17  exculpatory are Brady if the exculpatory character harmonizes

18  with the defense theory.  Mr. Young says that's the case here

19  because Witness 6 says that "G" shot first, so that is favorable

20  to a potential self-defense defense that Mr. Young could raise.

21  I guess technically it would be a justification defense under

22  state law.  That seems right to me.  So the government will have

23  to identify this individual in time for the defense to attempt

24  to speak to that person or do further investigation.

25          The defendant argues that Witness 7's statements are

1   Rule 16 because the witness was at the party but didn't observe

2   the shooting, although apparently observed some incidents that

3   evening.  Not Rule 16 for the reasons previously discussed and

4   nothing exculpatory in that material, and I have looked at all

5   of the underlying reports, I should make clear.

6          The defendants argue that Witness 8 should be turned

7   over on the same theory as Witness 6 under *Mahaffy*, and again,

8   same ruling.  I agree.  So the government will have to identify

9   this person in a timely fashion.

10         The defendant says Witness 9's statements are Brady

11  because the witness said that Young and Fennell did not shoot

12  first and that Young was shot by "G."  It's clear from the

13  report, however, that Witness 9 has no personal knowledge and is

14  only reporting what he heard, and defense counsel can

15  investigate what he says by speaking to the people that the

16  witness spoke about, specifically Shablacky, the bartender and

17  Brian.

18         Defendant argues that Witness 10's statement is

19  Rule 16 because that witness said that Mr. Young shot Shablacky.

20  That's not Rule 16 for the reasons previously stated, and it's

21  not exculpatory, so it's not Brady; and in any event, this

22  witness did not know anything personally, and having looked at

23  the report, the witness does not even know the identity of the

24  persons that the witness overheard speaking, so identifying her

25  would not be helpful.

1          The defendant says that Witness 11's statement is

2    Brady because that witness's information is that people other

3    than Mr. Young and Mr. Fennell were the ones who shot "G,"

4    specifically that five kids from the city who the witness named

5    were the shooters.  Witness 11 did not know anything and only

6    heard a rumor.  The report does not indicate from whom Witness

7    11 heard the rumor.  The information provided to the defendants

8    is enough for them to investigate because Witness 11 named the

9    five kids from New York City, and I don't see any indication

10   that the government knows from whom Witness 11 heard this

11   information; but if the government does know, they should let me

12   know because that may be something that needs to be turned over

13   in some form.

14          The defendant argues that Witness 12 -- Witness 12's

15   information is Brady on the same theory as Witness 11 because

16   Witness 12, as recorded in the September 21, 2018 letter,

17   reported that somebody named "City" shot "G" over an old beef.

18   Witness 12 heard this, but I think the government, having looked

19   at the notes of the interview of Witness 12, I think the

20   government misread those notes.  The way I read them -- let me

21   just look at them to make sure I am right -- the way I read

22   them -- hold on.  Let me find them and make sure I am correct.

23          If the government can help me out, I don't know if you

24   have your submission to me.

25          MS. NICHOLS:  We don't have the unredacted submission

1  with us, Your Honor.

2          THE COURT:  All right.  I think it's -- yeah.  It's

3  Exhibit M to your submission to me.  The way I read those notes,

4  Witness 12 did not say that he heard someone named "City" shot

5  "G" over an old beef.  He said that he heard that someone from

6  the north side of the city shot "G" over an old beef, and when

7  the government goes back to look at these notes, they should

8  focus on the arrow at the top of the page.  So it's pretty clear

9  to me what the witness said was that he heard someone from the

10 north side of the city shot "G".  If that lets out members of

11 the Southside Gang, that is helpful to the defense, except, as

12 with Witness 11, Witness 12 only heard this rumor and does not

13 say from whom, but if the government knows from whom, again,

14 they should let me know because at some point that lead may need

15 to be disclosed.

16          As to Witness 13, again, the defendant argues it's

17 Brady because, as with Witness 11, because Witness 11 says that

18 "Bigga," Mr. Branch, and someone named Alex King were shooting,

19 and that "Bigga" might have shot "G" because "G" shot Mr. Young.

20 Witness 13 doesn't have any knowledge.  He only heard this, and

21 he only described generically who he heard it from, some people

22 in a club.  There is information for defense counsel to work

23 with here.  They can speak to "Bigga," and they can speak to

24 this Alex King, but again, if the government knows the source of

25 Witness 13's information, they need to let me know.

1          And finally, there is somebody designated as CI-1,

2   which the defense again argues should be turned over under a

3   *Mahaffy* theory because CI-1 said that "G" shot first, and

4   Mr. Young returned fire.  CI-1 did not know anything personally

5   but heard afterwards that Mr. Young and his crew had robbed "G"

6   and his crew earlier in the day, and when they crossed paths at

7   the party, "G" started shooting at Mr. Young; and CI-1 also

8   heard that Mr. Young, nicknamed "Hollywood," was at the party

9   with someone named "Marquis" and other people who hung out on

10  South and Chambers Street.  Again, CI-1 got this information

11  from someone else who's not identified in the reports, but if

12  the government knows or can find out who that person is, that

13  person's information seems to be, again, helpful to the defense;

14  and as with the other *Mahaffy* witnesses, that person should be

15  identified sooner or later.  If there is some reason why being

16  too specific could endanger someone, the government can give a

17  list of people who were at the party who the defense may want to

18  speak to, and they don't have to specify why; but if it's known

19  to the government who CI-1 got the information from, that

20  information is helpful, and the defense should get it.

21          Next, defendant wants the 3500 material 30 days ahead

22  of time.  I don't have the authority to order it, but I am sure

23  the government doesn't want to have lengthy adjournments for

24  defense counsel to review it.  If we have the situation that led

25  to the problems in my other case, for example, that 3500 for a

1  witness includes a large amount of prison calls, you've got to

2  turn it over far enough in advance for defense counsel to review

3  it, even if that's months ahead.

4         Regular 3500, by which I mean interview notes,

5  corroboration agreements, plea minutes, all that stuff, I think

6  I have already set a date for seven days ahead.  However, if

7  it's a witness about whom the government has no safety concerns,

8  or if it's already known to the defense that the person is going

9  to be a witness because of something that's already been turned

10 over, the government should make it two weeks ahead, given the

11 volume.  Otherwise, one week suffices in a case like this with

12 danger always a possibility and a trial that will go on for

13 three to four weeks, and not just a theoretical possibility, I

14 might add.

15        And when the government turns over the 3500, it should

16 advise defense counsel as to who it plans to call in the first

17 week so that the defendants know on whom to focus, and each

18 night during the trial -- I am sure the government will do this

19 anyway -- but they should give the defense counsel an idea of

20 who they are planning to call the next day, and I understand

21 sometimes things go sideways, and you need to call people out of

22 order, but give the defense your best guess each evening as to

23 who is coming next.

24        Finally, the defendant is asking for the

25 identification of confidential witnesses or confidential

1  informants or their production in court so that defense counsel

2  can ask in person if they will submit to an interview.  The

3  leading Supreme Court case on disclosure of informants is

4  *Roviaro*, 353 U.S. 53.  It says that, Where the disclosure of an

5  informant's identity or the contents of his communication is

6  relevant and helpful to the defense or essential to the fair

7  trial, the informant's privilege must give way."  That's 353

8  U.S. 60 to 61.  It went on to say at page 62 that there is no

9  fixed rule with respect to disclosure.  What's required is

10  balancing the public interest in protecting the flow of

11  information against the individual's right to prepare his

12  defense.  Whether or not disclosure is reversible depends on the

13  circumstances of the case taking into account the crime charged,

14  the possible defenses, the significance of the informer's

15  testimony and other relevant factors.  That's *Rovario* at 62.

16  See *Rugendorf v. U.S.,* 376 U.S. 528 at 534 to 35.  *U.S. against*

17  *Lilla*, 699 F.2d 99 at 105, and *U.S. against Ortega*, 471 F.2d

18  1350 at 1359.

19        The defendant is generally able to establish a right

20  to disclosure where the informant is a key witness or

21  participant in the crime charged; someone whose testimony would

22  be significant in determining guilt or innocence, but disclosure

23  of the identity or address of a confidential informant is not

24  required unless the informant's testimony is shown to be

25  material to the defense.  The testimony that could merely have

1  cast doubt of the general credibility of one of the government

2  witnesses is normally insufficient to overcome the informant's

3  privilege.  *U.S. against Saa*, 859 F.2d 1067 at 1073 to 74.

4          The only CI or CW that I know of is CI-1, who I have

5  discussed above, who doesn't know anything personally.  I don't

6  know if there were CI buys in this case.  For example, nobody's

7  given me any information about them, but I assume if there were,

8  the recordings and the lab reports, et cetera, have been turned

9  over.  Defendants haven't identified any such person or made the

10 showing that there is an informant who is a key witness or

11 participant whose testimony would be significant.  So without

12 more information, I can't evaluate the motion.

13         Is there someone or something that the defendant had

14 in mind?

15         MR. BACHRACH:  For CIs?  No.  For CWs, there are

16 several people we suspect but have not been confirmed yet, and I

17 don't think I should.

18         THE COURT:  Well, if these are people who are going to

19 testify, you know, if your definition of CW includes

20 cooperators, I don't know of any basis why they need to be

21 identified this far out.  If they have -- if you want to ask for

22 an interview, customarily, that gets passed to the lawyer for

23 the cooperator; and that cooperator will be identified in the

24 3500.  I don't fault you for wanting to cross your T's and dot

25 your I's by asking for an interview, but I think we all know

1  that's an exercise, a formality.  So at this point, I don't

2  think there is anything for me to order in that regard.

3          That's all I had.  I mean, that's enough.  I'm not

4  asking for more, but is there anything else we should talk about

5  today?

6          MR. PARKER:  May we have a moment to confer, please?

7          THE COURT:  Yes.

8          (Pause)

9          MR. BACHRACH:  Your Honor -- actually, one more

10  moment.  Sorry.

11          (Pause)

12          MR. BACHRACH:  Couple of things that we may just go

13  back very briefly to the Brady motion?  If Your Honor prefers a

14  written motion for reconsideration, I figured you wouldn't,

15  that's why I figured we might as well just take care of it now.

16  A couple of things, and this might need a clarification because

17  Mr. Parker and I heard different things.  So we might just need

18  to clarify what it was that Your Honor stated.

19          THE COURT:  Okay.

20          MR. BACHRACH:  With respect to the list of individuals

21  that you suggested that the government turn over, did you say a

22  list of every individual at the party that they spoke to?

23          THE COURT:  No.  No.  What I was saying is the --

24  there are a couple of witnesses who don't know anything and who

25  say they were told by someone, X, Y or Z.  It's not clear to me

the government knows who the someone is; but if the government knows who the someone is, and there is a reason why they don't want to say the someone who spoke to Witness 11 is John Smith because that will put John -- that will put Witness 11 or John Smith in danger, if they want to just give you a list of people you might want to talk to without saying John Smith is the one who gave CW his information, they can do it that way.

MS. COMEY:  If I may just clarify, Your Honor, that is just on the premise that we actually know who these particular witnesses were getting their information from.  To the extent we don't know the names, obviously, there is nothing for us to disclose.

THE COURT:  Correct.  And I know sometimes the government says, well, you know, Witness 1 heard this from someone, but if we identify who Witness 1 heard it from, it will identify Witness 1, and that puts Witness 1 in danger.  So we are not -- we don't want to identify Witness 1, and -- but if what Witness 1 -- if they know who Witness 1 is -- excuse me -- if they know who Witness 1 heard it from, and it's Brady, they've got to turn it over.  In which event, if they want to -- I don't want to use the word "bury it," but if they want to surround it with some other names so as to make it less obvious who spoke to whom while still giving the defense the information it needs, which is who is the person with the facts, it can do it that way; but yes, that's only if the government is in a

1  position to provide that information.

2          MR. BACHRACH:  Okay.  So that brings me to the other

3  point I wanted to make.  This is, I guess, with respect to

4  Witnesses 8, 9, 10, 11, 12 and 13.  The witnesses who were not

5  present who heard -- who heard information that constitutes --

6  sorry -- not Witness 10, take out 10 -- the ones who heard

7  information that could constitute Brady.  Now, Your Honor

8  suggested --

9          THE COURT:  That's what I am talking about.

10         MR. BACHRACH:  Right.  But Your Honor is suggesting if

11 they know who the person is.  If they don't know who the person

12 is, then the only way for us to inquire who those people are

13 would be to inquire of the witness who made the comment to them

14 that we heard someone else did it; and those witnesses might be

15 more amenable to speaking to us than to the government as far as

16 providing who that information was from.  So our only way of

17 investigating that subset of those witnesses, the ones the

18 government can't give us the information from, because they

19 don't have it, is for us to be able to speak with them

20 ourselves.  That is, the ones identified by number here.  And I

21 know the real -- the government's objections to that has been

22 security concerns.  While that may be true for some defendants,

23 I really -- I think the government would have to make a

24 specific, detailed explanation as to why it's required here

25 because Mr. Young is out on bail.  He is out on bail after a

 1 specific determination that he was not a risk of danger, and

 2 he's been out on bail for eight months.  If he was a security

 3 risk, we would know by now.

 4         THE COURT:  Well, first of all, that was over the

 5 government's objection you will recall.

 6         MR. BACHRACH:  Yes.

 7         THE COURT:  I didn't find by clear and convincing

 8 evidence that your client personally was a danger, but let's not

 9 be naive.  There are -- he is not going to go out and do

10 anything, but there is an enterprise we are talking about here,

11 a very violent one allegedly.  But I think the answer is

12 simpler.  They can't turn over what they don't have.

13         MR. BACHRACH:  But they have the names of the

14 individuals who provided them with a lead, at least, or were

15 providing us with a lead that there is Brady information out

16 that these people heard from someone else, and you are right.

17 You are right.  I am not trying to be naive, Your Honor, but I

18 have offered in my papers to accept that those names, subject to

19 protective order, that limits the information solely to counsel

20 and to counsel's investigator and not even to the defendant.

21         Now, I don't think, Your Honor -- I don't think anyone

22 would ever accuse counsel or an investigator of being part of

23 this enterprise.

24         THE COURT:  That's true.

25         MR. BACHRACH:  So there should be no security concerns

1    under those situations, and since that that is the only way --

2    it sounds like that is the only way with respect to at least

3    some of these witnesses, we are even going to be able to

4    investigate who told them that someone else -- who told that

5    person that someone else was the shooter, I think under those --

6    under that situation, at least subject to protective order, we

7    should be entitled to it.

8            THE COURT:  I am thinking out loud here, and what I am

9    thinking is, these witnesses who have arguably something helpful

10   to say, I mean, they are inculpatory in that they may have

11   identified your client as a shooter, but they are exculpatory --

12   I don't mean these witnesses, these witnesses' sources of

13   information -- but they are exculpatory in that they say that

14   "G" shot first, for example.  They may have more to worry about

15   from the rival side of things.  In other words, you know,

16   it's -- it's not simply, oh, Mr. Young is not a danger.  If

17   there is a witness who said, I saw "G" shoot, "G"'s buddies

18   could be a danger to that witness.  So there is I think a real

19   concern.

20           On the other hand, as I have said, Brady doesn't say

21   the government's obligation disappears if there is a safety

22   concern.  So let me hear from the government why the proposal to

23   make it for attorneys' and investigators' eyes only would not

24   suffice.

25           MS. NICHOLS:  Thank you, Your Honor.

1          First of all, you know, the information that we have

2    disclosed we think does give defense counsel a good amount of

3    information to work with.

4          THE COURT:  Well, Mr. Bachrach is right in that --

5          MS. NICHOLS:  We are not disagreeing, Judge.

6          THE COURT:  If you say there is a guy who heard from a

7    guy something helpful, they are never going to get to the second

8    guy without knowing who the first guy is.

9          MS. NICHOLS:  We are not disagreeing, Your Honor.  I

10   think that everyone in this case wants the same thing:  We want

11   a fair trial and we want a safe trial, and it's just a balance

12   of those two concerns.

13         So what we have done in the first instance is ten

14   months before trial we provided this information about these

15   alternate perpetrators that were the subject of these rumors

16   that individuals heard on the streets.  That allows defense

17   counsel to work on those alternate perpetrator theories trying

18   to chase down some of the content of the information; and then

19   as to the source of the information, we understand

20   Mr. Bachrach's position, and we do contemplate that as to, I

21   believe it's Witness 12 -- 11, 12 and 13, that we would be

22   turning over attorneys' eyes only to Mr. Bachrach the names of

23   those people, and we were thinking about a month before trial.

24   We think that that would be a sufficient amount of time for

25   counsel to chase down that information, to see if those people

1  will be interested in speaking with defense investigators, and

2  to follow up as needed.

3          Your Honor, I do want to say that the safety concerns

4  here are not limited to Mr. Young himself.  I mean, the

5  government does have safety concerns about Mr. Young being out

6  on bail and living with his brother, who is an uncharged member

7  of the Southside Gang.  However --

8          MR. BACHRACH:  Excuse me.  He is not living with his

9  brother.  He is not -- he is actually precluded from contacting

10 him, having communications with his brother.

11         MS. NICHOLS:  Okay.  That being said, Your Honor,

12 there are a number of people in Southside who are not charged,

13 and but the point that I was trying to make is that this is

14 bigger than any particular gang member here.  We know from this

15 very case and from other Newburgh cases that in Newburgh there

16 is a culture of retribution towards people who speak to law

17 enforcement, and so the government does have a concern that,

18 notwithstanding that Witness 11 is only able to say that he or

19 she heard a rumor, that the fact that Witness 11 voluntarily

20 spoke to the police is going to subject Witness 11, and possibly

21 his or her family, to threats or worse from people who are

22 completely unrelated to the case; and the Facebook messages that

23 Your Honor has seen in this case have shown that that is true.

24 There have been Facebook threats and comments from people who

25 are not charged and not really factually connected to the crimes

1  charged in the Indictment here.

2          So those are the safety concerns that the government

3  is anticipating, and we believe that the disclosures that we

4  have already made and the ones that we anticipate making closer

5  to trial will adequately balance those concerns.

6          THE COURT:  Well, I don't really quarrel with what

7  you've said.

8          I mean, Mr. Bachrach, if you think that there are

9  others who fall into the same category as 11 through 13 that you

10  should also get, you should talk to the government and come back

11  to me if you have unresolved differences; and maybe you can

12  twist their arms and get it a little sooner than a month, but I

13  do think, as I have said, not only is there alleged to be a very

14  violent group of people involved in this case, but --

15          (Phone interruption)

16          THE COURT:  There's got to be a way to turn it off.

17          I have already seen in this case evidence of the

18  culture that the government describes, and as I said, even if

19  these people are helpful to Mr. Bachrach's client, the deceased

20  had a crew; and if they share that culture, or at least it seems

21  like he did, that person could have worries from that side as

22  well.  So it's a serious concern.

23          I don't minimize it, and obviously, the government

24  should do whatever it can to assist these people because their

25  names are going to become, not public, but known to at least the

1  lawyers and, you know, it would be a real shame if that made

2  people even more reluctant to speak to the police than they

3  already are.

4          However, my job is to make sure the defendants get a

5  fair trial, and that's the government's job, too, and seems to

6  me, a month before and for counsel and counsel's investigators'

7  eyes only and only -- it seems to me there won't -- if what

8  happens is these people who don't know anything themselves point

9  counsel or an investigator to a third person who does, there is

10 really no need for these names ever to come out.

11         If there is -- if an attorney gets something for his

12 or her eyes only and believes that there now is a reason, we

13 will talk about that and do whatever is necessary to make sure

14 that the defendants here get a fair trial and to hope nobody

15 else is endangered beyond what we have already seen.

16         Okay.  Did that cover what you were concerned about?

17         MR. BACHRACH:  Yes, Your Honor.  Thank you.

18         THE COURT:  All right.  We don't have our next get-

19 together for a while.  We've got --

20         MR. TULMAN:  Your Honor, if I may, just to be clear, I

21 had joined in the motion by Mr. Bachrach and Mr. Parker, so I

22 would trust that to the extent disclosures be made available,

23 because these counts really do pertain to my client as well.

24         THE COURT:  This is the Valentine's Day party?

25         MR. TULMAN:  This is the Valentine's Day, yes.  So it

 1 would be applicable to me as well, and that's acknowledged by

 2 the government.

 3          MS. NICHOLS:  Yes, Your Honor.

 4          MR. TULMAN:  And the other thing, Your Honor, in terms

 5 of just not 3500 material or Brady, but just discovery, just a

 6 general inquiry of the government whether there is additional

 7 discovery that has not yet been produced in this case.

 8          THE COURT:  Well, you know how they are.  They are

 9 going to be subpoenaing things up until closing argument.

10          MR. TULMAN:  I understand that.  I mean, I note, for

11 example, Your Honor --

12          THE COURT:  They are not sitting on anything, that's

13 what you want to make sure.

14          You guys aren't sitting on anything, are you?

15          MS. NICHOLS:  No, Your Honor.  The only issue that we

16 need to discuss with defense counsel, and I don't know that we

17 need to do it before Your Honor, is the phones have been

18 produced to the defendants as individual discovery; and so we

19 need to have an understanding from defense counsel as to whether

20 they would prefer that we would cross-produce them to everyone

21 involved under the protective order, which I think is the most

22 expedient way to do it and could be done basically now, or

23 whether they want us to separate out the Rule 16 from the

24 nonresponsive personal material, which would take some time.

25          Again, I don't know that the Court needs to weigh in

1   on that question, but that is the outstanding --

2            THE COURT:  You can chat about it.

3            MS. NICHOLS:  -- nature of the Rule 16.

4            MR. TULMAN:  I was -- in my mind, I was thinking of

5   Shablacky's medical records is one thing on my list that we have

6   never received, and I would presume that by this point the

7   government would have in their possession those medical records.

8            THE COURT:  Well, you need to ask them.

9            MR. TULMAN:  Right.

10            THE COURT:  And, you know, I am presuming that the

11   only things they are holding back are things that are safety

12   related or, you know, there is a logistical issue.  They are not

13   going to sit on Rule 16 material for no reason.  Maybe they

14   haven't gotten Shablacky's records, but they will now or maybe

15   you can ask for it.

16            So we are going to have motions in limine.

17            MR. MIEDEL:  Your Honor, I am sorry.  There is the

18   remaining issue of pretrial motions for Mr. Hawkins.

19            THE COURT:  Yes.  Yes.  We need to set a schedule for

20   those, and you had proposed something and that looked all right

21   to me.  Let me just find that letter.

22            Mr. Davis and Mr. Hawkins will make their motions

23   March 18th.  Opposition April 1.  Reply April 15th.  Let's see

24   if we can find a day in May for me to give you rulings on those

25   motions.

PROCEEDINGS                    61

1            Oh, and we also need to set a date for the hearing on

2    Mr. Young's postarrest statements.  Do we have something like

3    right after Memorial Day?

4            MS. SHELLOW:  Excuse me, Your Honor.  I am in trial

5    before Judge Donnelly in the Eastern District starting on the

6    28th of May, which I believe is that first Tuesday after

7    Memorial Day.

8            THE COURT:  All right.  Then let's get the week

9    before.  I have a trial May 6th that's going to be two to

10   three weeks, but let's live dangerously.  Let's say May 24th.

11   That should be pretty clear, right?  All right.  May 24th at

12   9:30 for rulings on the motions.

13           Hearing on Mr. Young's postarrest statements, my March

14   has kind of opened up because I had to adjourn that other case.

15   What have we got on March 7th?  I am just picking a random day.

16           MS. NICHOLS:  March 7th, Your Honor?  That's fine.

17           THE COURT:  I am not sure if He Who Must Be Obeyed has

18   approved it.  Find us a date, find us a half a day around there.

19           MR. BACHRACH:  Your Honor, that entire week I will be

20   in El Salvador on an MS-13 case.

21           THE COURT:  Oh, okay.

22           MR. BACHRACH:  And I will be out a lot of the

23   following week as well.

24           THE COURT:  We could do it -- no.  Mr. Bachrach can't

25   do it.  So that would be either the end of this month or the

PROCEEDINGS                                        62

```
 1  week of March 18th.  What do we have like March 21st or 22nd?
 2              THE DEPUTY CLERK:  March 22nd is good, 10:00 a.m.
 3              THE COURT:  March 22nd.  Let's make it 9:30 just in
 4  case.  March 22nd, 9:30 for the suppression hearing.
 5              Give the -- give Mr. Bachrach the 3500 on March 18th.
 6  I am not sure there will very much, but -- okay.  And we've got
 7  motions in limine due May 24th and opposition June 3rd.
 8              Enterprise letter, is that going to come with the
 9  motions in limine?
10              MS. NICHOLS:  If not before, Your Honor.
11              THE COURT:  Let's do it a week before.
12              MS. NICHOLS:  Okay.
13              THE COURT:  Enterprise letter May 17th, and we've got
14  our final pretrial conference June 24th.
15              MS. SHELLOW:  Your Honor, replies to the motions in
16  limine on the 10th?
17              THE COURT:  I don't really want replies.
18              MS. SHELLOW:  Okay.
19              MR. BACHRACH:  I'm sorry, Your Honor.  I didn't hear
20  the enterprise letter date?
21              THE COURT:  May 17th.  And the parties should talk
22  either as to whether the government is moving to admit all of
23  that or the defendants are moving to preclude it, but there is
24  no reason why both should do it.
25              MS. NICHOLS:  I am sorry, Your Honor.  I think we
```

1    missed that on our end.

2          THE COURT:  I am saying with the stuff in the

3    enterprise letter, either the government should make a motion to

4    admit it or the defense should make a motion to preclude it, but

5    not both.

6          MS. NICHOLS:  Yes, Your Honor.

7          THE COURT:  So you guys can figure out how you want to

8    do it.

9          MR. PARKER:  Did you set a time for June 24th, Your

10   Honor?

11         THE COURT:  I think we previously had set it for

12   10:00 a.m.  If you are going to turn it over ahead of time, they

13   can make a motion to preclude or you can make a motion to move

14   it in.  I don't care.

15         And proposed jury instructions and voir dire questions

16   are also due June 3rd, and we will pick the jury July 8th as

17   scheduled and hope we won't run into too many problems with

18   vacations and stuff like that.

19         All right.  Anything else we should do now?

20         MS. NICHOLS:  Nothing from the government, Your Honor.

21         MS. SHELLOW:  Nothing from Mr. Davis.

22         MR. TULMAN:  Nothing from us, Your Honor.

23         MR. BACHRACH:  Thank you, Your Honor.

24         THE COURT:  All right.

25         (Time noted:  12:45 p.m.)