```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  UNITED STATES OF AMERICA,

 4
                             Case No. 17-cr-364
 5       -vs-

 6  TEVON ADAMS,

 7                        Defendant.

 8  ------------------------------------x

 9                            United States Courthouse
                              White Plains, New York
10                            March 14, 2019
                              10:08 a.m.
11

12  Before:
               HONORABLE CATHY SEIBEL
13
                              District Judge
14

15  APPEARANCES

16  GEOFFREY S. BERMAN
         United States Attorney for the
17       Southern District of New York
    KATHRYN MARTIN
18       Assistant United States Attorney

19  THE HENRY LAW FIRM PLLC
    BRADLEY HENRY
20  Attorney for the Defendant

21

22

23

24

25
```

PROCEEDINGS                                      2

1           THE DEPUTY CLERK:  The Honorable Cathy Seibel

2  presiding.  United States versus Adams.

3           THE COURT:  Good morning, Ms. Martin and Mr. Henry,

4  and Mr. Adams.  Everyone can have a seat.

5           MR. HENRY:  Good morning, Judge.

6           MS. MARTIN:  Good morning, Your Honor.

7           THE COURT:  I am going to start by putting on the

8  record what I have received in connection with the sentencing.

9  I have the presentence report, which is dated January 23rd of

10 this year.  I have Mr. Bradley's sentencing memo with

11 attachments, which is dated February 28th, and I have the

12 government's letter, which is dated March 7th.  Is that

13 everything I should have?

14          MS. MARTIN:  Yes, Your Honor.

15          MR. HENRY:  Yes, Your Honor.

16          THE COURT:  All right.  Mr. Adams, have you read the

17 presentence report?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Have you gone over it with your lawyer?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Mr. Henry, you have read the presentence

22 report and gone over it with your client?

23          MR. HENRY:  I have, Your Honor.

24          THE COURT:  Do you have objections to the factual

25 material in the presentence report?

1          MR. HENRY:  No, Your Honor.

2          THE COURT:  Does the government have objections to the

3   factual material in the presentence report?

4          MS. MARTIN:  No, Your Honor.

5          THE COURT:  All right.  Then the findings of fact in

6   the presentence report are my findings of fact.

7          We have one guidelines issue I guess that we should

8   discuss before I hear from the parties on what the sentence

9   should be.  There is a difference between the plea agreement and

10  the presentence report in that probation did not hit Mr. Adams

11  with two points for committing the instant offense while serving

12  a criminal justice sentence under 4A1.1(d) of the sentencing

13  guidelines.

14         The application notes to that guideline, specifically

15  note four, define a criminal justice sentence as, "a sentence

16  countable under 4A1.2 (definitions and instructions for

17  computing criminal history) having a custodial or supervisory

18  component."

19         The parties seem to think that the defendant's prior

20  conviction was a criminal justice sentence, even though it

21  wasn't counted under 4A1.2, and the government's explanation is

22  that while it may not count under 4A1.2(a)(1), we should really

23  be looking at 4A1.2(c), which describes sentences counted and

24  excluded, and under there it's countable.  It seems a little bit

25  of a stretch, Ms. Martin.  The -- I will give you an opportunity

1  to explain to me why I should disregard 4A.2(a)(1), which says

2  it doesn't count and look only at 4A1.2(c).

3          MS. MARTIN:  Your Honor, I suppose really just because

4  4A1.2(c) is titled Sentences Counted and Excluded whereas 4A1.2

5  is just entitled Prior Sentence.  I agree it's not the strongest

6  of arguments and is not necessarily --

7          THE COURT:  I expect better from you, Ms. Martin.

8          MS. MARTIN:  I -- Your Honor, I did not --

9          THE COURT:  The record should reflect I was just

10  making fun of Ms. Martin.

11          MS. MARTIN:  Yes, I spoke to Ms. Comey about this,

12  actually, because she anticipated that this would be an issue at

13  the sentencing.

14          THE COURT:  She mentioned it in her letter.

15          MS. MARTIN:  Yes.  So we discussed it, and it's my

16  understanding that it is practice to include it for the reason I

17  just stated that in 4A1.2(c) that title, that subsection is

18  specifically entitled Sentences Counted and Excluded, and as you

19  noted in the application note, it specifically cites having

20  means of sentence countable under 4A1.2.  So countable you would

21  look to 4A1.2(c) as opposed to 4A1.2(a).

22          I also just think it's worth noting that even if Your

23  Honor finds that it doesn't fit within that application, it's

24  certainly something you could take into account under 3553(a).

25          THE COURT:  I am certainly going to take it into

1  account, but I am really not buying the government's argument,

2  and I don't know if it's Ms. Comey or Ms. Kelly or Ms. Nichols

3  who wrote the letter.  They gave it the college try, but I don't

4  read it the way the government does.  4A1.2(c) essentially says

5  certain minor offenses aren't counted.  4A1.2(a)(1) describes

6  certain other offenses that aren't counted, specifically those

7  that are part of the instant offense.

8           4A1.1 note four, in defining a criminal justice

9  sentence refers to 4A1.2 in total, even by its name.  It doesn't

10 say a criminal justice sentence means a sentence -- a sentence

11 countable under 4A1.2(c).  It refers to the whole note -- to the

12 whole guideline, and I am going to apply the whole guideline.

13 So I think probation is correct.  I can also tell you it's

14 probably not the difference between what the parties stipulated

15 to, which was 51 to 73 months, and what probation finds, which

16 is 46 to 57 months.  It's probably not going to -- not going to

17 make a difference here, but I do think that probation is

18 correct.

19           Okay.  Does the government wish to be heard?

20           MS. MARTIN:  Your Honor, just briefly, I think as set

21 forth in the government's sentencing submission, there are

22 obviously some aggravating factors here and certainly some

23 mitigating factors.

24           I think the aggravating factors are, in comparison to

25 some of Mr. Adams' co-defendants, it seems that he was motivated

1  by greed as opposed to a heroin addiction; and that he could

2  have had legitimate employment, and instead chose to support his

3  life-style by selling heroin.  That being said, as noted in

4  probation's -- as in the probation report, and in the

5  government's submission, since his arrest in this case,

6  Mr. Adams has made very good progress.  He's stayed clean.  I

7  guess he previously did have a drug problem, but has been clean

8  since 2015 or 2016; and that he also has held two jobs and seems

9  capable of maintaining legitimate employment; has the support of

10 his family; has been complying with the terms of his pretrial

11 supervision.

12          I should have noted, too, on the aggravating side that

13 he committed this while on probation.  So even if Your Honor

14 doesn't -- which Your Honor found doesn't assess those two

15 points, I certainly do think it is a relevant factor to take

16 into account that he committed the instant conduct while he was

17 on probation.

18          So I would note that this is kind of an unusual case

19 I think in terms of the aggravating and the mitigating.  I do

20 think the discount provided for by probation, even their

21 calculation is 46 to 57 months, so they recommended time served.

22 That's a huge break.  So I think the guidelines, given the

23 amounts, and even if Your Honor doesn't take into account the

24 fact that he committed it on probation, if you take it by the

25 guidelines, but taking into account 3553(a), I think 46 to

1   57 months isn't an unreasonable sentence, or is a reasonable

2   sentence, and I do think that there are other reasonable

3   sentences.  It's just not quite clear to me that time served is

4   appropriate here.

5            THE COURT:  I know this isn't your case, but the

6   conduct, as far as I can tell, if the March 2015 conduct was

7   part of the instant offense, then I gather it lasted at least

8   from March 2015 through the date of arrest, which was two years

9   later.

10           Do we know -- can you be any more specific as to the

11  timeframe of the defendant's involvement?

12           MS. MARTIN:  Your Honor, I cannot.  I mean, the

13  conspiracy I would note is 2014 through 2017.

14           THE COURT:  I don't know.  That's the --

15           MS. MARTIN:  The conspiracy.

16           THE COURT:  And this defendant was not part of the

17  Southside Gang, as I understand it.

18           MS. MARTIN:  That is correct.  He is not part of the

19  Southside Gang.  I think he was associated with it, but he was

20  certainly not -- we are not representing that he was a member of

21  that gang.

22           But I apologize.  I don't have in any more specific

23  information other than his conviction, which is in 2015.

24           THE COURT:  And another question:  I can never

25  remember, you know, how many bags in a bundle and how many

PROCEEDINGS                    8

1  bundles in a brick and how many ounces in -- how many grams in a

2  bag and all that; but is it fair to say that 400 grams

3  represents many thousands of bags?

4          MS. MARTIN:  I believe that's correct, Your Honor.  I

5  think it's ten grams.  It's .8 or something like that in a

6  glassine bag, I think.

7          THE COURT:  .8 of a gram, no.  It's way less than

8  that.

9          MS. MARTIN:  Okay.  So then it definitely is a

10 significant amount.

11         THE COURT:  I mean a bag -- just one glassine -- you

12 know what --

13         MS. MARTIN:  It's significant.  400 to 700 is a

14 significant amount of heroin.

15         THE COURT:  I don't think a bag has nearly a gram,

16 but --

17         MS. MARTIN:  That's right.  It doesn't have a gram,

18 but it's 400 to 700 grams of heroin is a significant amount of

19 weight.

20         THE COURT:  Yeah, it's, you know, give or take half a

21 kilo, but in terms of individual bags and how much people used,

22 I am a little fuzzy on that, but I will remain a little fuzzy on

23 that and just not consider how many doses.  I will just consider

24 the total weight.

25         Mr. Henry, I will hear whatever you want to say.

```
 1              MR. HENRY:  Thank you, Your Honor.

 2              I won't belabor the point.  I mean, I think Mr. Adams

 3   has done a really spectacular job since his arrest.  I think to

 4   answer the Court's question, this is a discussion that I had

 5   with the U.S. Attorney's Office when we were talking about a

 6   resolution in this case, which was about what his conduct was in

 7   relation, and it was -- our discussions about that were that his

 8   conduct was all relevant conduct in terms of what he did prior

 9   to 2015 and what he is charged with in this case.

10              It's my understanding that after that conviction,

11   there was no more -- there was no more from my client in terms

12   of selling.  So it's all --

13              THE COURT:  So this is --

14              MR. HENRY:  -- all is interrelated.

15              THE COURT:  Well, this isn't -- this is news.  Your

16   position is that after his arrest on March 10, 2015, he no

17   longer was involved?

18              (Pause)

19              MR. HENRY:  So my understanding is that after that

20   arrest, there was no more selling; that it was --

21              THE COURT:  Well, that's a little fishy because your

22   client was picked up on a wire in 2017 talking to Mr. Fennell.

23   So --

24              MR. HENRY:  I am sorry.  Let me --

25              THE COURT:  -- get your facts straight.
```

```
 1              (Pause)
 2         MR. HENRY:  So I think in terms of the conspiracy,
 3  Your Honor, I don't want to get into it.  The fact of the matter
 4  is, my client pled guilty to the offense.  He sold heroin.  We
 5  are here to address that issue today.
 6         I think -- I mean, in terms of the amount of weight
 7  that he sold, it certainly was the majority of it prior to that
 8  date.  There are wires and conversations about that.  I think it
 9  was significantly reduced.
10         In terms of, you know, his involvement in the case, I
11  think there was a recognition from our side as well as the U.S.
12  attorney's side that my client was on the lower end of the
13  culpability spectrum in this case.  He, you know, was involved
14  as a street-level dealer.  We've addressed some of that in the
15  sentencing memorandum, which I won't rehash.
16         I think in terms of sentencing for him, right, the
17  government does point out that -- we agree with pretrial's
18  position that time served is an appropriate sentence with
19  supervised release, which will keep Mr. Adams under probation's
20  thumb; keep him doing what he needs to be doing and moving
21  forward in his life and with his case, maintaining his job,
22  taking care of his family, who, by the way, are here today,
23  along with his young son.
24         You know, he's done a really commendable job in
25  that -- in taking a really negative thing and turned it into
```

1  what could be perceived as a really positive thing.

2          There are certainly a range of options for the Court

3  between, you know, the guideline range sentence and time served,

4  including probation if the Court is wavering on that particular

5  issue.  The point being, a noncustodial sentence in this case is

6  appropriate for Mr. Adams for all of the reasons that probation

7  pointed out and for some of the reasons that the government says

8  makes some sense in this particular case.

9          I think from my perspective and my interactions with

10 Mr. Adams is that he clearly understands his actions.  He

11 clearly understands what happened in this particular case.  He

12 is ready to move forward with his life.  He has gotten it

13 together.  Putting him in jail will derail those efforts of his

14 pretty significantly, and in some cases that makes sense.  In

15 this case, I don't see that it does.

16         I think if you look at the 3553(a) factors, really the

17 one that they all weigh in favor of a noncustodial sentence in

18 this particular instance except for it's a serious offense.

19 Mr. Adams obviously recognizes this is a serious offense and has

20 pled guilty in accordance with that; and secondarily, general

21 deterrence, I think he has been specifically deterred,

22 significantly deterred in this particular instance.

23         General deterrence being what it is, I think the fact

24 that he was convicted and has pled guilty and will face severe

25 restrictions on his liberty for a significant period of time

1    would put others into a position to have to think about what

2    they are doing.

3           Unless the Court has any particular questions, I think

4    we have stated our position, and my client, I think, would like

5    to say a couple of words.

6           THE COURT:  Yes.  I will give him that opportunity in

7    a moment.  Just give me one second.

8           Is the government able to give me any more specifics

9    than appears in the sentencing letter regarding what the

10   defendant did in 2017 that says he was intercepted over a

11   wiretap on Mr. Fennell's cell phone in 2017.  Among other

12   things, they discuss the conspiracy supplier, the brand of

13   heroin the conspiracy distributed, and money owed by drug

14   customers.  At one point Adams also agreed to serve Fennell's

15   customers if Fennell left town for a vacation.

16          The letter doesn't say -- come out and say that the

17   defendant was still selling drugs at that time, although I think

18   it's a fair inference, but what exactly is on the recordings of

19   Mr. Adams?

20          MS. MARTIN:  Your Honor, it's my understanding that he

21   was -- first of all, it is my understanding -- it is the

22   government's position he absolutely was still involved in the

23   conspiracy and selling drugs in 2017.

24          The proof would include the wire intercepts.  It's my

25   understanding that the wire sort of largely discussed I think

1  it's mostly inferences, but there are intercepted communications

2  between Adams and Fennell discussing particularly stamps of

3  heroin in which Adams asked Fennell for a common supplier

4  believed to be part of Ruiz's crew had given Fennell a different

5  stamp; intercepted communications in which Adams agreed to serve

6  Fennell's customers if Fennell goes on vacation, and intercepted

7  communications in which Fennell told Adams that Fennell had cut

8  off a particular customer until that customer pays Adams back

9  what the customer owed Adams, and in addition to these wire

10 calls, it's also my understanding that there are cooperators who

11 would say that he was still selling in 2017.

12          THE COURT:  Thank you.

13          Anything you want to say, Mr. Henry, before I hear

14 from your client?

15          MR. HENRY:  No.  I don't think so.  Thank you.

16          THE COURT:  Mr. Adams, if you would pull the

17 microphone in front of you, I will hear anything you wish to say

18 now.

19          THE DEFENDANT:  Your Honor, I would like to say I am

20 sorry for everything.  Trust me, this is the last time you will

21 ever see me in this type of courtroom, and I just want to speak

22 about that -- that wiretap.  Even though all I can say is I was

23 not going forward with selling those drugs for Mr. Fennell.

24 I -- on that same wiretap they do have that I called him back

25 and said, no, I changed my mind.  I do not want to do that.

1  They might not mention that, but that is on that wiretap two

2  minutes later.

3          Prior to that, I have had my son, and I changed my

4  life around completely, and that was part of the reason I did

5  call back and said, no, I don't want to do it any more.  Right

6  now I have two great jobs.  One I am in training to be my

7  assistant manager of my department, and right now my biggest

8  thing is taking care of my son and family, keeping them in a

9  home, and basically teaching my son everything growing up and

10 how to learn and accept responsibilities and there's

11 consequences and everything in life.  So regardless of what

12 happens today, I want him to understand he has to accept his

13 response -- accept everything that happens in life, and so he

14 doesn't follow in the same footsteps I have.

15         THE COURT:  Well, I think we need to have a hearing

16 because Mr. Adams is taking the position that he didn't sell

17 after his state arrest, and the government is taking the

18 position he did.

19         Well, I take it back.  Mr. Adams is taking the

20 position that he didn't sell after his son was born, and

21 unless -- I am not sure exactly when that was.  Let's see, the

22 child is two, so that would have been --

23         MR. HENRY:  January 2017, Your Honor.

24         THE COURT:  So it will make a big difference to me if

25 Mr. Adams stopped selling after his arrest, and from what -- you

1   know, Mr. Henry's been consulting with his client on that

2   subject as I am sitting here.  What Mr. Adams just said

3   didn't -- wasn't quite, I stopped selling after my arrest; it

4   was, I stopped selling after my son was born, which was

5   January 17th, but the government says it has evidence that to

6   the contrary; and it will make a difference to me, A, if the

7   government cannot prove that the defendant was selling after his

8   arrest, that will make a difference; and B, if the government

9   can prove that Mr. Adams just lied to me, that will make a

10   difference.

11          So I think I need to know whether, you know, what's on

12   those recordings and what the government's evidence is before I

13   can understand what's appropriate.  If, in fact, Mr. Adams was a

14   model citizen after his arrest, or if -- at one end of the

15   spectrum; or if at the other end of the spectrum he just lied to

16   me, or even if he did sell after his arrest, but not after his

17   son was born, in other words, if he gave up the criminal life on

18   his own before his arrest, that will make a difference to me.

19          So I don't want to assume the worst nor do I want to

20   assume the best.  I would like to know what the facts are.  So

21   let's set a date for a hearing.

22          Let's see, I could do it the week of the 25th.  I was

23   suppose to have a bench trial that went away.  I don't know if

24   that gives the government enough time to prepare, given that I

25   know it's not your case, Ms. Martin, but --

 1            MS. MARTIN:  I think maybe later in the week on the --

 2    of the 25th if Your Honor has available.

 3            THE COURT:  Let's see what we have toward the end of

 4    that week.

 5            THE DEPUTY CLERK:  March 28th at 10:00 a.m.

 6            THE COURT:  Okay.  We probably need a few hours.

 7            THE DEPUTY CLERK:  Oh, a few hours.

 8            THE COURT:  Yes.  This is going to be an evidentiary

 9    hearing, so we will need a few hours.

10            (Pause)

11            MS. MARTIN:  I was just -- Ms. Comey is out next week,

12    so she asked if we could do it sometime in April so she has

13    sufficient time to prepare.

14            THE COURT:  How about April 3rd?  April 3rd at 9:30.

15    All right.

16            MS. MARTIN:  Your Honor, also just -- we will get the

17    transcript from this hearing, but just -- from this preceding,

18    but I just want to make sure I understand so I can relay it

19    accurately to Ms. Comey that the purpose of the hearing would be

20    I guess two-fold:  One, whether he distributed or continued to

21    sell after his March 2015 arrest, or 2015 -- I think it was

22    March 2015 arrest, and then also I think if the son was born in

23    January of 2017, if he continues to engage in the conduct after

24    that date.  Is that fair?

25            THE COURT:  Correct.  Because it would -- one of the

1  aggravating factors here is that the defendant was arrested with

2  183 bags in March 2015, and if he continued to sell heroin, that

3  would be an aggravating factor.  If he stopped, that would be to

4  his credit.

5          Second, if the defendant stopped when his son was

6  born, which was several months before his arrest, that would

7  also be to his credit; but if he didn't, and he was untruthful

8  with me just now, that would be to his detriment.

9          So yes, those are the two factual issues, and, you

10 know, look, if the government says it can prove that the

11 defendant was selling after January 2017, and if it can, that

12 will answer both questions.

13         MS. MARTIN:  Right.

14         THE COURT:  And it may be that the government -- I

15 don't know when the wire on Mr. Fennell went up.  I don't know

16 what the witnesses will say, but if the government doesn't have

17 any evidence of the window between March 2015 and before the

18 wire went up, so be it.  If they can prove what they say they

19 can prove, then, you know, we know that the defendant was

20 intercepted in March 2015 -- 2017.  If that is the timeframe of

21 most of the conversations, obviously, that is after

22 January 2017, and, you know, I didn't write down word for word

23 what Mr. Adams said to me today, but he said that there is a

24 conversation after the one where Mr. Adams agrees to cover

25 Mr. Fennell's clients while he is away where he calls back and

1    says, no, I am not doing that.

2          And he said that he changed his life completely

3    because he had a son, and I think he said he was no longer doing

4    that kind of thing.

5          So I will, obviously, have to look at exactly what he

6    said to see if the evidence at the hearing contradicts it, but

7    even if it doesn't, in other words, even if the defendant didn't

8    say anything dishonest just now, I still want to know whether or

9    not he stopped selling after his March 2015 arrest because that

10   is an aggravating factor, and since, as we all acknowledge,

11   there are significant mitigating factors here, you know, I want

12   to -- I want to be able to weigh the relative weight I should

13   give to each set of the factors.

14         So I think when Mr. Adams pleaded, Mr. Henry convinced

15   me to leave him out pending sentencing, and I reluctantly said

16   okay, but told Mr. Adams to be prepared to go in at sentencing.

17   I will let him stay out and keep working pending the hearing on

18   April 3rd, but depending on how that goes, he ought to be

19   prepared to go in that day.  I'm not saying he will.  I'm just

20   saying he ought to be prepared.  All right.  I will see you

21   folks April 3rd.

22         MR. HENRY:  Thank you, Your Honor.

23         MS. MARTIN:  Thank you, Your Honor.

24         (Time noted:  10:14 a.m.)

25